Charles Basil PEKAR, Appellant,

v.

UNITED STATES of America, Appellee.

No. 19676.

United States Court of Appeals Fifth Circuit.

April 4, 1963.

Charles E. Watkins, Jr., Atlanta, Ga., for appellant.

Robert H. Newman, Asst. U. S. Atty., Alfred E. Sapp, Asst. U. S. Atty., Miami, Fla., Edith House, U. S. Atty. for the Southern District of Florida, for appellee.

Before TUTTLE, Chief Judge, WOODBURY,* Chief Judge, and BELL, Circuit Judge.

TUTTLE, Chief Judge.

This is an appeal from the conviction and sentence of appellant on six counts of an indictment charging him with being in possession of personal effects which he knew had been stolen after having been in possession, as baggage, of a common carrier for interstate transportation in violation of Section 659 of Title 18 U.S.C. Sentences aggregating fifteen years were imposed on the appellant.

The principal ground urged by appellant for the reversal of his conviction was the failure of the trial court to exclude from evidence the articles of personal belongings that were discovered by Federal investigative agents while in appellant's hotel room which they visited and discovered without a search warrant and without an arrest.

Equally serious is the ground that the trial court erred in overruling a motion for mistrial filed on appellant's behalf when it was made to appear that during one of the recesses during the trial the Assistant United States Attorney prosecuting the case sat down in the corridor with one or more jurors and carried on a lengthy conversation, dealing with the juror's business "and other matters". It is not contended that the attorney mentioned the case on trial.

Because of the significance of the conduct of the prosecuting attorney in the conduct of the trial of criminal cases, we are impelled to discuss first the improper communication with the juror as a ground for reversal of the conviction. As is customary in the Federal Courts, the jury was not immured from access by the public during recesses in the trial, and after the recess for lunch on the day of trial the following exchange took place betwen counsel and the trial judge.

"MR. LEHMANN: (Counsel for appellant) I have something that I don't believe concerns the jury, but I believe should go on the record, however.

(Thereupon counsel for the respective parties and the Reporter approached the Bench and the following proceedings were had out of the hearing of the jury:)

* Chief Judge of the First Circuit, sitting by designation.

"MR. LEHMANN: I saw what purported to be a conversation between Mr. Newman, the Government prosecutor, and Juror No. 331, the insurance agent, Mr. Wittenstein, who is Juror No. 7 at the box. And, of course, although innocent as it may be, I did observe that.

"The defense is of the opinion that private communications between a juror and either counsel for the prosecution or the defense, without both of them being present, is prejudicial error and might be a basis for a mistrial. And I request—If I am wrong, I thought I did see you out there sitting at the table—or, at the chair in the hallway before coming back into the recess.

"And I request that if a conversation was going on—To me, upon best information and belief, a conversation was in process. And I request that if there was a conversation in process that the substance of the conversation be stated into the record.

"I am not moving for a mistrial at this time, but I would, if such a conversation did exist, I would request it to be stated for the record at this time. And, if I am wrong, why, please correct me.

"THE COURT: That is something I know nothing about.

"MR. LEHMANN: I observed that and I—

"MR. NEWMAN: We were sitting outside and talking, your Honor, in the hallway about the bonding business and other matters. I think I have said, 'Hello' to almost every juror since we have started this case.

"THE COURT: The law is that the jury will observe the admonitions I gave them and not talk about the case.

"MR. LEHMANN: I am aware of that. And the fact that saying, 'Hello,' to a juror is one thing—carrying on a conversation. I, as an Attorney, am very reluctant to carry on a conversation with any juror unless I specifically request opposing counsel to join in that conversation.

"Now, if Mr. Newman was talking about the bonding business, I don't know whether that is in connection with any bonding business of your own, or the bonding business in connection with the courts.

"Since Mr. Wittenstein is an insurance agent, I feel that it is a matter that might be prejudice in this case as him sitting as a juror.

"And I request that Mr. Newman state in more detail, with the Court's permission, as to what the nature of this bonding business conversation was.

"MR. NEWMAN: Well, if I can remember, I did not pay much attention to it. He said he was in the bonding business in Broward County. He told me where his offices were and he named some of the companies he represents. And he does not write any criminal bonds. He mentioned that. He writes mostly construction bonds, and things of that type.

"And I don't recall much more than that. It was just a general conversation about his business, not the bonding business but the insurance business he is in.

"THE COURT: Not about the case.

"MR. NEWMAN: He said he had nine employees working for him. He said he had a comfortable living. He wrote a bond this morning for $161,000. Someone called him about a building that they started three weeks ago and he charged them a percent one one-half interest on the bond.

"He said that he makes, I think, a third of what he charges as a premium in writing these bonds. I believe he said he had two or three salesmen working for him and the

rest are clerical help to fill out forms, and things of that type.

"He has power of attorney from several bonding companies to do these bonds.

"I do not recall anything else. That was the general mode of the conversation.

"THE COURT: Is that all you wanted for the record?

"MR. LEHMANN: Yes. At this time, on the basis of what was stated, I make a motion for a mistrial.

"THE COURT: Which motion will be denied.

■ Thus, without even admonishing counsel as to the impropriety of his saying "Hello" to every member of the jury and sitting down and engaging in a conversation with one of them, presumably in the presence of any others who were passing through the corridors, the trial court permitted the case to go then to the jury, one of whose members at least had established a social contact with the prosecuting attorney. Such conduct is not only inexcusable, it is clear grounds for the setting aside of a conviction. It is not surprising that very few cases can be found in the Federal Courts where this subject is discussed. This is because such conduct is rare. However, the language used by the Supreme Court in Mattox v. United States, 146 U.S. 140, at page 150, 13 S.Ct. 50, at page 53, 36 L.Ed. 917, sets the standard. "Private communications possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."

In Palmer v. Miller, 60 F.Supp. 710, a District Court case which was presided over then by the learned trial judge who conducted the trial now before us for review, the court had occasion to comment on the impropriety of counsel for one of the parties to a *civil case* conducting a conversation with the jury during the intermissions of the court. The Court there quoted from the Missouri case of McGraw v. O'Neal, 123 Mo.App. 691, 101 S.W. 132, 137, as follows:

"It is the duty of litigants and their attorneys to refrain, while the trial is in progress, from seeking the companionship of jurors during the necessary adjournments and recesses. They should avoid even the appearance of evil, and, when it is brought to the attention of the trial judge that any person interested in the result of the cause on trial is attempting to court favor with jurors by any sort of attention, a prompt and sufficient rebuke should be administered, and should it appear that a party or his counsel with improper design has succeeded in bestowing favor on a juror, though it consists of nothing more than social attention, a verdict in favor of the offending party should be set aside."

In the case of Palmer v. Miller the trial judge then commented as follows:

"Attention is called to the above case, not with the idea that the facts become so important in the present case, for the reason that on other grounds a new trial should be granted, but the admonitions of the opinion should be kept in mind generally by litigants and their attorneys in trying cases."

Since the rule as quoted above is clearly the universal understanding of the proprieties in the conduct of a civil trial, a fortiori it must be recognized that even a stricter standard, if possible, is required in a criminal case.

■ The appellant preserved the point for our review by making a motion for mistrial when this conduct was called to the Court's attention. Even if he did not do so, it is of such importance in the administration of justice that this court would be under the duty of noticing it as plain error under F.R.Crim.P. 52(b).

Since this court is remanding the case for a new trial, however, it becomes appropriate for us to comment on the other ground of appeal. The same question

will be before the trial court on remand and, since we conclude that the court erred in not suppressing the evidence found as a result of the search in Pekar's hotel room at the time of the original visit by the F.B.I. agents, we proceed to answer the question.

Taking the evidence adduced on the motion to suppress the evidence most strongly in favor of the Government, the trial Court could find the following facts. The F.B.I. had been notified by one of the commercial airlines in Miami that several pieces of luggage had been missing from the air terminal there. On further investigation, the F.B.I. learned from one of the air terminal limousine drivers that he had driven a man carrying several pieces of luggage to Miami Beach, stating that he let him off "around 20th and Washington Avenue" and that he, the driver, saw the man enter the Barclay Plaza Hotel. The driver had seen this person on a previous occasion at the terminal and had carried on a conversation with him. Knowing that some luggage had been missing from the terminal, the driver's suspicions were aroused. The driver related this information to agent Beale, Beale went to the Barclay Plaza Hotel and asked the desk clerk whether a man of a certain description had registered there, giving the desk clerk the same description the limousine driver had given him. The clerk said "yes" and gave the room number of the defendant. Beale got another agent to come to the hotel, it being the common F.B.I. practice to have two agents on hand at an "investigation," and both went up to the defendant's room. At no time did the agents obtain either a search or arrest warrant.

Upon arrival outside defendant's room, they knocked. Defendant answered, "who is there?" to which Beale replied, "I want to talk to you regarding an official investigation of the F.B.I." The de-

fendant declined to answer, and the agents waited outside the door for 10 minutes, and again asked the same questions. The defendant asked how he would know that they were from the F.B.I., and the agents presented their identification through the louvers of the outer louvered door, there being double doors to defendant's room. He then asked for more proof, and Beale gave him the telephone number of the F.B.I. office and told him to call, but to the knowledge of Beale, the defendant did not call. Then the defendant opened the door and the agents walked in displaying their credentials.

Upon entering, the agents observed some luggage, consisting of trunks and suitcases, some open and some closed, and men's, women's and children's clothing piled up in the room and hanging in the closet. The agents asked defendant if these things belonged to him, to which he replied no, he had never seen them before. The agents asked him whether, if they didn't belong to him, he would mind if they looked through them. They also asked defendant if he minded if "we look around" and he said no. On a search of the bathroom the agents discovered a bunch of keys on a ring, approximately 150 in number, in the commode tank.[1] Defendant told the agents he knew nothing about the keys, as he had said of the clothes and baggage.

Beale said that on two occasions they presented the defendant with a form of waiver of a search warrant, and that on each occasion he refused to sign, stating that he was not going to sign anything until he had spoken with his attorney. He asked permission to make a phone call, which he made to a local bondsman. Beale testified that defendant spoke to the bondsman's answering service concerning the agents' presence in his room, but was not any more specific as to their conversation. The bondsman met the defendant later at the office of the F.B.I. to which the defendant accompanied the

---

1. Beale testified that while they were waiting to be let in they heard the defendant scurrying around in the room, and heard the distinct sound of the lifting of the lid of the commode tank, an immediate splash and the replacing of the lid. This is what led to their discovery of the keys.

**324**

agents when they took the clothes and baggage from his room into their office. Beale told defendant that they were taking the articles down to the F.B.I. office since he had said they did not belong to him. Beale's testimony here was that defendant said he wanted to go down with them and "get this thing straightened out." Beale told defendant that the latter was not under arrest. Defendant later left the F.B.I. office, stating that he would be back the next morning, which he never did. The defendant was arrested about seven months later in another state.

Beale testified that the "defendant was confused" during the time they were in his room.

Beale testified that he realized that he did not have probable cause for an arrest without a warrant, nor did he have sufficient evidence specific enough to get a magistrate to issue a search warrant. Clearly, then, the only question, with regard to the motion to return and suppress, is whether the defendant freely and voluntarily consented to the search of his premises.

■■ It is clear that in the absence of a search or arrest warrant the premises of a person may be searched if there has been given to the authorities a free and voluntary consent that they may do so. Calhoun v. United States, 172 F.2d 457, 5th Cir. But it is equally clear that if this consent is obtained by the use of force or pressure, or where superior authority had any place in the obtaining of the consent, the consent is no consent at all, and the constitutional guarantees against unreasonable searches and seizures have been violated. Canida v. United States, 250 F.2d 822, 5th Cir. It was stated in this last cited case that:

> "Especially is this the case (i. e., that constitutional rights have been violated) in situations of this kind, involving such a disparity of position as that of the government agent and this humble defendant. Here, after failing to induce or force her to sign a consent, the agents, after

consulting with superior authority and getting backing for their forcing their way in, proceeded with the search under the wholly untenable claim that, though they had been unable to get her to agree in writing to consent, they had obtained her free and voluntary oral consent, in short her invitation to enter her home and search it out." 250 F.2d at 825.

This Court in Ray v. United States, 84 F.2d 654, 656, 5th Cir., in emphasizing the inviolability of the home, said:

> "In respect of homes the constitutional provision against unreasonable searches and seizures may not be relaxed to find volitional, acts which the evidence leaves no doubt were, if not expressly, impliedly coerced."

The United States Courts of Appeals for the District of Columbia and 9th Circuits have expressed a view more extreme than the one of this circuit; Judd v. United States, 89 U.S.App.D.C. 64, 190 F.2d 649; Channel v. United States, 285 F.2d 217, 9th Cir. In Judd, the defendant told narcotics agents that "my apartment is clean. There is nothing there. You can go out and search the place." (the defendant at the time he made this statement was in jail). As to whether the defendant had voluntarily and freely consented to a search of his premises, the court said:

> "Conceivably, that is the calm statement of an innocent man; conceivably, again, it is but the false bravado of a small-time criminal. But, however it be characterized, it hardly establishes willing agreement that the officers search the household without first procuring a warrant. Comparable statements have been held insufficient where the victim of the search was safely in his home * * *." 190 F.2d at 651.

The Court of Appeals for the Ninth Circuit quoted with approval the above language and holding in Channel. Similarly, see also, Higgins v. United States, 93 U.S.App.D.C. 340, 209 F.2d 819:

"[N]o sane man who denies his guilt would actually be willing that policemen search his room for contraband which is certain to be discovered. It follows that * * * words or signs of acquiescence in the search, accompanied by denial of guilt, do not show consent; at least in the absence of some extraordinary circumstances, such as ignorance that contraband is present." 209 F.2d at 820.

We find that the defendant was impliedly coerced into submitting to the search of his hotel room. The record clearly indicates that the defendant did not want the agents to enter his room. It was only after their persistent efforts that he let them in. When the agents first knocked on the door requesting entrance "for an official investigation," the defendant refused not only to let them in for 10 minutes, but also did not answer them. On the second request for admission, after the agents had presented their identification through the louvered door, the defendant wanted further identification. Finally, upon entrance the agents both walked in displaying their F.B.I. identification, clearly creating an aura of officialdom.

An even more important factor evincing the defendant's reluctance to admit the agents, let alone submit his room to a search, was his refusal to sign a search waiver tendered to him on two separate occasions by the agents after they had gained entrance. Furthermore, agent Beale testified that the defendant seemed confused. We think that the decided cases require the conclusion that the agents' superior position to that of the "confused" defendant was the motivating force behind defendant's opening of the door and allowing the agents to

"look around" once they were inside. This is a clear illustration of the ease with which law enforcement officers can gain entrance to a home without a search warrant. Even Agent Beale admitted that he did not have enough evidence (before he obtained entrance into defendant's room) to obtain a search warrant from a neutral and detached magistrate.

There is an additional circumstance that convinces the Court that the defendant did not freely and voluntarily consent to a search of his room. The agents merely told defendant when he asked what they wanted that they wanted to talk to him about an investigation not that they wanted to search his room, which they did in order to substantiate their meager suspicion gotten from the limousine driver. We do not say that this circumstance alone would have altered our decision, but merely wish to point out that the presence of that circumstance further convinces us of the constitutional violation. The agents gained admission to defendant's room by a representation of their reasons for wanting the door opened. That may well have misled him to think that this "investigation" did not in any way involve him. Of course, the investigation did involve Pekar as a suspect.[2]

We conclude that the trial court erred in not suppressing the evidence resulting from the search of Pekar's room. It follows that the judgment of conviction and sentence must therefore be set aside.

The Court is indebted to appointed counsel for his service in representing appellant at the request of the court.

Judgment is reversed and the case remanded for a new trial.

2. Cf. Crawford v. United States, 219 F.2d 207, 209, footnote 1, 5th Cir., where this court found a valid consent. The agents in that case knocked on the door and when the occupants came to the door

the agents told them they had some bad information about one of them selling Marihuana and that they wanted to search the premises.