**UNITED STATES of America,**
**Appellant,**

v.

**HARRY BARFIELD COMPANY, Inc.,**
**Appellee.**

**No. 21948.**

United States Court of Appeals
Fifth Circuit.

April 12, 1966.

Coleman, Circuit Judge, dissented in part.

Carolyn R. Just, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, David O. Walter, Attys., Dept. of Justice, Washington, D. C., Charles L. Goodson, U. S. Atty., Slaton Clemmons, Asst. U. S. Atty., Atlanta, Ga., for appellant.

J. Winston Huff, Edward E. Dorsey, William L. Kinzer, Atlanta, Ga., Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., of counsel, for appellee.

Before TUTTLE, Chief Judge, and BELL and COLEMAN, Circuit Judges.

GRIFFIN B. BELL, Circuit Judge:

Appellee taxpayer is a Georgia corporation engaged in commercial printing. The business was conducted as a partnership for several years prior to the formation of the corporation in 1958. The three partners formed the corporation by transferring the assets of the partnership to the corporation. They became the sole stockholders, receiving common stock and ten year six percent debenture notes for the assets. The District Director concluded that the debenture notes did not evidence a bona fide indebtedness but were actually contributions to capital. Interest payments made in fiscal years 1958 and 1959 theretofore claimed as deductions under 26 U.S.C.A. § 163(a) were disallowed. Taxpayer paid the deficiencies assessed, and suit for refund was filed after claims for refunds had been denied. The suit for refund was tried to a jury; judgment was entered on a verdict for the taxpayer; and this appeal followed the denial of the government's motion for new trial.

An unusual approach, made on one of the jurors in the presence of two other jurors by the president of taxpayer corporation, is the basis for one of the assignments of error. The president was a principle witness for the taxpayer at the trial. He was one of its three stockholders. When the court adjourned for the noon recess following the charge to the jury and prior to the submission of the case to the jury, the president and his brother's wife chanced to enter the elevator with the three jurors for the purpose of leaving the building. Certain conversation took place between the president and two of the jurors on the elevator and just after leaving the elevator. This conversation was called to the attention of the court by counsel for the United States immediately after the noon recess.

It was contended that the conduct of the president was improper and prejudicial and that a new trial was in order. Apparently counsel intended to use the term mistrial rather than new trial but the relief sought was clear to all concerned. The court disposed of the question presented by questioning the president and his sister-in-law out of the presence of the jury, and then letting the case go to the jury. The court adopted the procedure of reserving judgment with the end in mind of granting a new trial if the jury should render a verdict for the taxpayer and prejudice appeared from the conduct of the president in conversing with the jurors. The court did not wish to examine the jurors at that juncture of the case. The following testimony of the president in question and answer form is pertinent:

"Q. * * * did you have any conversation with any of the jurors after the lunch recess?

*      *      *      *      *      *

"A. As we were going down in the elevator, one of the jurors, let let me see, yeah, one of the jurors, Mr. Lockhart, I asked Mr. Lockhart if he was the one that operated a Lockhart Pharmacy, and he said that he was.

"Q. Was Mr. Lockhart the only juror who was there?

"A. No, I believe there was another one going down in the elevator.

I can't call his name. I spoke to him, in other words, I said, 'Hello,' or something like that.

\* \* \* \* \* \*

"Q. Did you have any further words or contact after you got out of the elevator?

"A. Let me see. Well, we were in the process of walking out of the elevator, and he said that he was the Mr. Lockhart who had a drugstore on Boulevard, I believe it was. And I mentioned to him that my wife had lived in that area on Boulevard and he said, well, he did know the family, and then we were in the process of walking out, and we walked on out.

\* \* \* \* \* \*

"Q. And there was another juror present?

"A. Yes, there was. There was another one with him coming down, but as I say, I can't call the man's name because I don't know the jurors by name.

\* \* \* \* \* \*

"Q. Did you know Mr. Lockhart?

"A. No. I don't. I actually do not know the gentleman. The name had come up, and I don't know, I just happened to wonder if he, when he got up and said who he was, he said he was a retired druggist as I recall and I just happened to wonder if he was the one, that I knew there was a Lockhart Drugstore many years ago on Boulevard, which might be a mistake, which had no bearing or anything on the case, but I do not know the gentleman and he did not know me.

"Q. Well, did he say anything else, anything to the—you, to the juror?

"A. I don't remember that I—oh, wait a minute. Wait a minute. There was another juror in the elevator. I have forgotten about him completely. Neither do I know him either. Let's see, the man had been a, I think he is the one that has been an announcer, a radio announcer or something.

"Q. Stocky man with slightly balding hair?

"A. Yes. He was in the elevator. I had forgotten about him. I'm sorry. As he came out, what did he say, I believe he said he did not know me, that he did not remember me or something, but he remembered later that he had known my brother or something like that. But I didn't know the man.

"Q. The man from WSB?

"A. Yes.

"Q. Had known your brother, \* \* ?

"A. Well, I'm not sure which one he referred to, really. It was more or less a casual remark that he made, and as I say, about that time we were all going out in our separate ways into the rain, and I momentarily had even forgotten he was in the elevator.

\* \* \* \* \* \*

"Q. The initial inquiry was as to Mr. Lockhart's former business?

"A. Yes, I did ask him if he was the same Dr. Lockhart that had had a drugstore on Boulevard.

\* \* \* \* \* \*

"Q. What did [your sister-in-law] say?

"A. I don't really recall that she said anything. It—I don't think she did \* \* \*

"Q. Now, when you say the 'drugstore,' you meant that your wife knew of a drugstore and her family lived in the area?

"A. Yes, my wife's people had lived in that general area.

"Q. Did you mention the fact that any member of your family or relatives had patronized that drugstore?

"A. No, sir. I just simply stated what I stated, my wife's people—

"Q. Had you—

"A. —had lived in the area, sir.

"Q. Had you or any member of your family patronized the drugstore?

"A. No."

The sister-in-law then testified to what the president said at the time:

"A. Well, when he spoke to this one gentleman, it seemed that Carroll's wife when she was a child lived in the same neighborhood with this gentleman, when she was a girl going to school, and they just passed the comment they knew that this, that she was a Boles, and I don't think at first he got the connection there who it was, and then somebody else spoke to Carroll, and he just says, 'Hi,' and I don't know whether he knew him or not, or just spoke, because sometimes people in the hall, since we've been here, you'll just nod to them. But as far as me speaking to them, no, sir, I have not."

After the rendition of the jury verdict, the juror, Mr. Lockhart, testified in chambers. It appeared that the third juror in the elevator served as foreman of the jury. He simply heard the conversation. There is no testimony that any remarks were directed to him. Mr. Lockhart gave his recollection of the conversation as follows:

"A. Well, we were talking about personal matters. He says, he says, [the president] says, 'Don't you —I bet you know my wife.' I says, 'Who was your wife?' And he says, 'Ray Boles.' I says, 'Well, I have known her ever since she was a little girl.' I said, 'I didn't know you married her, though.' And I says 'Where are her brothers? Are they living?' He says, 'Yeah, they are living.' He told me some place. I said, 'Is Mrs. Boles living, Ray's mother?' He said, 'Yes, she's living, but her daddy is dead.' And then we went on and I went,

and got dinner and went on some place."

It was clear that there was no discussion of the case, and Mr. Lockhart testified in response to questions from counsel for the taxpayer that his decision as a juror was in no way influenced by the conversation. The court then overruled the motion for new trial, saying that it did not think any harm had been done by the occurrence.

By way of summation it is clear that the taxpayer president approached the jurors. They did not approach him. He sought to identify with juror Lockhart through the fact of knowing about his drug business. He then sought to cement the identity by giving the juror his wife's name which led to a conversation regarding his wife's family. He apparently also managed to find out that the juror from the radio station had known his brother.

The taxpayer argues and the court concluded that no harm was done by this activity. The juror did testify that he was not influenced, and it would no doubt be difficult to have a juror admit that he was influenced by such an approach. The average person might sincerely believe that he was not influenced, and the juror here may not have been influenced. However, if the occurrence is such as to be so inherently unfair as to reflect on the jury system, we think a mistrial should be declared or, as the matter was handled by the court here, a new trial should be granted. Over and above the rights of the litigants, the jury system could not long survive abuse of the type here made out. In Pekar v. United States, 5 Cir., 1963, 315 F.2d 319, where the impropriety did not exceed, if indeed it reached the level reached here, the court said: "Such conduct is not only inexcusable, it is clear grounds for the setting aside of a conviction." That decision was founded on the impropriety of a social contact which resulted in a long but random conversation during a recess between a juror and the Assistant United States Attorney prosecuting the case relating to the juror's business. There was no discussion of the

case. It is true that no evidence was offered there to show that the juror was not influenced but we reversed, saying that the conduct would have been plain error under Rule 52(b), F.R.Crim.P., even in the absence of objection. We treated the conduct as being prejudicial *per se* and not subject to being overcome by a showing of harmlessness.

Here, the president of the taxpayer corporation deliberately sought to identify himself with one of the jurors in a way that would have been impossible through an inadvertent or accidental meeting. It required the effort of first inquiring about the drugstore, and then letting the juror know to whom he was married. This conduct cannot be excused. We do not consider the approach on the juror who was employed by the radio station. We have not overlooked it, but the facts concerning that approach were not fully developed; and it formed no part of the government's objection in the District Court nor is it relied on here.

In Mattox v. United States, 1892, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917, the Supreme Court said:

> "It is vital * * * that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment. Nor can any ground of suspicion that the administration of justice has been interfered with be tolerated."

That case does suggest that a verdict rendered under such circumstances may be saved if forbidden communications with jurors are made to appear harmless. But, as in *Pekar*, we think the harm is inherent in the deliberate contact or communication which exists under the facts of this case. Every case of this kind turns on its own peculiar facts, but the harm here appears to a degree which may not be overcome; and thus prejudice or harm appears as a matter of law. The conduct here was deliberate and intentional as distinguished from a mere inadvertent or accidental contact involving only an exchange of greeting in order to avoid an appearance of discourtesy. See Annotation, 62 A.L.R.2d 298 (1958).

*Pekar* and *Mattox* are criminal cases but the integrity of the jury system is no less to be desired in civil cases. Our system of trial by jury presupposes that the jurors be accorded a virtual vacuum wherein they are exposed only to those matters which the presiding judge deems proper for their consideration. This protection and safeguard must remain inviolate if trial by jury is to remain a viable aspect of our system of jurisprudence. Any conduct which gives rise to an appearance of evil must be scrupulously avoided. What occurred in this case exceeded the bounds of propriety and will not do. The case must be reversed for a new trial.

The United States also urges two additional assignments of error. It is contended that the court committed error in permitting one of the partners in the law firm representing the taxpayer to testify as an expert in the case. The record discloses he was placed on the stand and qualified as an expert in corporate and tax law. The only objection interposed was on the basis that an expert might not invade the area of law reserved for the court. There was no merit in this objection. Expert testimony was proper on the characteristics of debenture notes and common stock. Cf. VII Wigmore on Evidence, 3d Ed., 1940, § 1955. The witness participated in the formation of the corporation and also testified negatively that there was no intent to treat the debenture notes as capital stock. No question of his competency to testify as an expert or as to facts in view of his position as counsel was preserved for appeal. The same is true as to any question of propriety. On the question of competency, see French v. Hall, 1886, 119 U.S. 152, 7 S.Ct. 170, 30 L.Ed. 375; Modern Woodmen of America v. Watkins, 5 Cir., 1942, 132 F.2d 352; Steiner v. United States, 5 Cir., 1943, 134 F.2d 931. On the question of propriety, and the weight to be given such testimony, see Lau Ah Yew v. Dulles, 9 Cir., 1958, 257 F.2d 744; Sears

Roebuck and Company v. American Plumbing & Supply Co., E.D.Wis.1954, 19 F.R.D. 329; VI Wigmore on Evidence, 3d Ed., 1940, § 1911; Canon 19, Canons of Ethics of American Bar Association; and Canon 3–119, Canons of Ethics of State Bar of Georgia. See also "The Testifying Advocate" 41 Texas Law Review 477.

■ Lastly, the United States contends that the court committed error in allowing counsel for the taxpayer, over objection, to argue the law of the case to the jury. The fact is that the law was argued to the court in the presence of the jury. There was no objection on the ground that the law was cited to the court in a misleading or otherwise improper manner. We hold that the court did not abuse its discretion in overruling the objection. The court stated to the jury at the time that the argument was addressed to the court, and also in the charge the court stated that the jurors were to take their instructions on the law from the court.

Reversed and remanded for further proceedings not inconsistent herewith.

COLEMAN, Circuit Judge (concurring in part and dissenting in part).

I concur in that part of the opinion of the majority which holds that the trial court committed no error in permitting one of the partners in the law firm representing the taxpayer to testify in the case. I likewise concur in the holding that the trial court committed no error in allowing counsel to argue the law of the case to the court in the presence of the jury. Obviously, it was not prejudicial error in this particular instance. I would, however, make it clear that if I were personally presiding over a jury trial I would not permit the law to be argued in the presence of the jury.

I must give expression, however, to my earnest disagreement with the holding of the majority that there must be a reversal because of the conversation on the elevator.

Whether the conversation was such as to justly cast suspicion upon the verdict was a question for the determination of the trial court in the exercise of sound legal discretion. Cf. Annotations 55 A.L.R. 751 and 62 A.L.R.2d 295.

The trial judge did hear testimony and found the conversations harmless. That finding is overwhelmingly supported by the evidence. We should let it rest there.

I believe the true rule was announced in California Fruit Exchange v. Henry, 89 F.Supp. 580, affirmed 3 Cir. 1950, 184 F.2d 517:

"The courts look with suspicion upon any communications between parties to a suit or their counsel and the jury impaneled to try it; and if such communication is had and it appears that a conversation was had about the suit, or the communication is not explained satisfactorily, it will, in itself, be ground for a new trial. If, when explained, however, it can be seen that in the communication nothing was said about the case and nothing was done for the purpose of influencing the mind of the jury, and that the communication or conversation had no influence of the verdict which was reached, no ground exists to set the verdict aside for the reason that said comment could not have been prejudicial."

On what authority does the majority reach the present result? Only two cases are cited.

I agree that Pekar v. United States was correctly decided, but that was a criminal prosecution, in which none other than prosecuting attorney engaged one of the jurors in conversation about the bonding business in which that juror was engaged. The impropriety and likely effect of such a conversation are plain.

The majority also cites Mattox v. United States, another criminal prosecution, in which the defendant had been convicted of murder and sentenced to death. It is true that Mr. Chief Justice Fuller there used the language quoted in the majority opinion, but he also said:

"Private communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer

in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear."

I invite attention to the language, "at least unless their harmlessness is made to appear".

It must be quickly pointed out that the conversation with which we are here involved was not private at all. Nor do I consider that there was an "approach". The case had already progressed to and through the argument of counsel. The court was in recess for the noon luncheon. The undisputed proof shows that the jurors got on the elevator first. They held the doors open so that Mr. Barfield and his sister-in-law could get in the elevator and ride down with them. The authorities hold that Mr. Barfield was under no duty to refuse this polite gesture and thereby risk offending the jurors. It is true that if he had declined the hospitable gesture, no opportunity for the conversation would have taken place. And it is also true that had the jurors not held the doors, the point would not now be before us.

From an examination of this record I am unable to find any warning or direction from the trial judge that the parties and jurors were to have *absolutely no communication*. They were told not to discuss the case, and the case was not discussed here. So, what we have is a reversal and a new trial because of a casual conversation, in the presence of a number of people, in a public elevator, in a public building, at noon day,—a conversation which the juror, an experienced business man, flatly swore had no influence on him whatsoever. As future cases are tried, even to the point of completing argument to the jury, if a litigant sees that matters have not gone well with him he can slyly frustrate the entire proceedings and guarantee a mistrial, if his adversary falls for it, by striking up a conversation on a public elevator, in the presence of others, dealing with nothing any more serious than inquiring about possible mutual acquaintances.

The majority opinion states, although no such findings were made below, "it is clear that the taxpayer president approached the jurors. They did not approach him". At another point, the majority states, "the president of the taxpayer corporaton deliberately sought to identify himself with one of the jurors in a way that would have been impossible through an inadvertent or accidental meeting". Again, there were no findings to this effect in the court below and I submit that there is no testimony to support such a finding here, even if we had the power to make findings. Nothing, in my view, if I had the power to make a finding, could appear more inadvertent or accidental than to have someone hold the doors to allow me to board a public elevator for a ride downstairs to lunch.

True, the conversation was opened by Barfield, but talk of mutual acquaintances in this section is just about as common as speaking of the weather. It is often an overworked item of polite conversation when the parties do not know of anything else to talk about.

The majority opinion does not contain the following undisputed testimony of the juror, to which the government offered no objection:

"Q. Was anything said about their business or any part of the case?

A. Oh, no. He had more sense than that, I think.

THE COURT: This doesn't mean there is any implication or impropriety, but whenever any juror ever has any contact with any party, it frequently happens that way, they run together or pass pleasantries or something like that, but still we also like to have it cleared up.

A. Well, I know better than that, to discuss any thing like that.

Q. (by counsel for appellee) Your Honor, may I just complete the record by asking Mr. Lockhart whether this conversation, whether the content of this conversa-

tion in any way influenced his decision in the case (omitting interpolations) ?

MR. LOCKHART:

A. No, No, I have been in the business world all my life, ever since I was big enough to walk. I don't let business and something else have anything to do with my duty. None at all".

The Government, in its brief, cites Ryan v. United States, 1951, 89 U.S.App. D.C. 328, 191 F.2d 779. This was a criminal prosecution for robbery. The prosecuting attorney talked to several members of the jury about other matters during recesses in the trial. The court held that fraternizing or the appearance of it between counsel and jurors should be carefully avoided, but affirmed the conviction on the ground that the conversations had not been prejudicial. The court further held that the trial judge was entitled to take the testimony of the jurors, subject to cross examination, as to whether or not they were biased by such conversations.

In sustaining the Trial Judge in *Ryan*, the Court of Appeals stated (at p. 783):

"The searching inquiry conducted by the trial judge for evidence of bias or prejudice gives adequate support to his negative conclusion on this question of partiality. * * * We hold in the present case that the question of bias or prejudice was susceptible of an intelligent judgment by the trial judge on the evidence adduced upon the hearing on the motions, and that we are not warranted in over turning his conclusion."

The opinion of the majority, in my judgment, is directly in conflict with the principles announced in *Ryan*.

I agree that no party to any suit should ever say a word to a juror. Laymen, however, do not understand this as lawyers should. The appellees should not be required to forfeit their verdict because of this elevator conversation after the trial judge heard the evidence and found it harmless.

If Barfield should have been punished for the conversation, the trial court could have inflicted it under its powers of contempt. It is significant that it did not see fit to do so.

I must confess, too, that I do not feel any overwhelming approval for the free ride the appellant got out of this situation. If the verdict had been for it, any question of prejudice from this conversation would have disappeared from the case. The Government would have had its verdict, regardless of the holding we now encounter that the conversation was prima facie, incurably, and fatally infectious.

I would adhere to the rules announced in *California* and *Ryan* and affirm this Judgment.