186 So.2d 811 (1966)
Manuel TALAVERA, Appellant,
v.
STATE of Florida, Appellee.
No. 6543.
District Court of Appeal of Florida. Second District.
May 25, 1966.
*812 Levine & Freedman, Tampa, for appellant.
Earl Faircloth, Atty. Gen., Tallahassee, and William D. Roth, Asst. Atty. Gen., Lakeland, for appellee.
HOBSON, Judge.
Appellant was convicted of robbery and sentenced to twenty years at hard labor. By a motion to suppress and timely objections at the trial, appellant attempted to exclude from consideration of the jury certain evidence alleged to be illegally seized; the trial court ruled against him and submitted the evidence to the jury. The appellant has assigned this ruling of the trial court as error.
During the late hours of November 29, 1964, Mr. Ivan Linn, owner and operator of Linn's Motor Court, Nebraska Avenue, Tampa, Florida, phoned the radio dispatcher at the Hillsborough County Sheriff's Department to report that one of his tenants, Manuel Talavera, appellant herein, closely resembled a newspaper description of a person involved in a Tampa robbery. Thereafter, around midnight, two deputies from the Hillsborough County Sheriff's Department and one detective from the City of Tampa Police Department arrived at the motor lodge.
During this discussion the following facts were learned:
(1) the weekly rent on appellant Talavera's cabin was due on Sunday, November 29.
(2) normally appellant paid his weekly rent to owner Linn on Sunday morning.
(3) appellant had failed to pay his rent on this particular Sunday and technically his rent was overdue or delinquent.
It appears from the record that Mr. Linn's motivating purpose in calling the police was not to report that tenant Talavera was a couple of hours overdue in paying his rent, but after the above conversation, the officers accompanied Mr. Linn to the cabin occupied by Talavera for the alleged purpose of informing him that his rent was overdue and Mr. Linn was demanding his removal from the premises.
The officers knocked on the door and shone their flashlights through the windows in an effort to awaken the appellant. The record contains the following narration by appellant Talavera of the events preceding the officers' entry into the cabin:
"A Well, then, we saw lights coming in. I guess they were shining flashlights in from the front door. And they went around the back and side of the house and knocked on the window and shined the light in. And, then, they quit for a while. *813 And we just laid there in bed. We didn't answer the door But, then, they came back and started knocking, again.
Q All right. At that time did the people or person who was knocking at the door announce themselves and tell you why they were knocking?
A No, sir, not at the time.
Q All right. Did anybody outside the door ever announce themselves as to who they were or why they were there?
A Well, after a while they kept knocking and they said that, then I heard one of them say that he was a Deputy Sheriff. And, then, we still didn't answer the door. And, so, they started to break the door down.
Q All right. What did you do, then?
A Then, I went and answered the door."
Upon entry into the cabin, which occurred sometime between 1:30 and 2:00 A.M., the Deputy Sheriff informed the appellant that the rent was overdue and that Mr. Linn wanted them to vacate the premises. Thereupon Talavera replied, "I will give you the rent now, if that is what you want." But the record shows Mr. Linn "didn't do anything." He stated, "Well, I didn't, under the circumstances that we went in there, under suspicions and stuff, I mean, I usually accept the rent in the office." In fact, appellant was permitted by Mr. Linn not only to make payment the next day but also to remain in the cabin for an additional week.
After concluding their initial inquiry as to the delinquent rental payment, the record reveals the following unrefuted testimony of appellant Talavera made during the hearing on the motion to suppress the evidence in question:
"Q All right, what next happened, Manuel?
A Well, then, I remember we were all right there in the front room at first, and then I remember one of the sheriffs that were in uniform, he walked toward the kitchen, I think, and he just glanced around and was looking around there. And then Deputy Sheriff Rodriguez started just glancing around, walking around the room. And he asked me if he could look around.
Q What did you say to him, then?
A Well, I told him, `yes', because I figured I didn't have no other choice, because he could have done it, anyway.
Q All right. Did the Sheriffs then proceed to search all over the premises?
A Yes, sir.
Q Did they go through the cabinets, in the drawers and shelves and everything else?
A Yes, sir.
Q Now, did the Sheriff say anything to you or anyone of them say anything to you at that time in the room about the property that they found?
A No, sir.
Q Did they place you under arrest?
A No, sir.
Q What happened next?
A Well, they just told us that we were going to have to go down to the Sheriff's Office, and they wanted to talk to us.
Q Did any of the Sheriffs say to you that any of the property that they had seized would be used against you in connection with any criminal proceeding?
A No, sir.
Q Were you ever advised at that time that anything that you may say may *814 be used against you in connection with any criminal proceeding?
A No, sir.
Q Were you advised at that time as to your right to counsel?
A No, sir."
In their search of the premises the officers found two revolvers, a large quantity of silver coins, cancelled checks, a stocking and three raincoats allegedly used in a recent robbery.
Thereafter, the appellant and Richard Martinez were taken to the Police Department's interrogation room where they underwent some two to three hours of questioning and participating in a police line-up. Thereafter appellant was released and returned to his cabin at the Linn Motor Court. Several days later he was arrested on a warrant charging him with robbery.
The Fourth Amendment of the United States Constitution and Section Twenty-Two of the Declaration of Rights of the Florida Constitution, F.S.A. both provide similar constitutional safeguards for the right of the citizenry to be secure in their persons, houses, papers and effects against unreasonable searches and seizures. There are several recognized exceptions to this constitutional safeguard.
"No search or seizure is permissible under the law without a proper warrant duly issued, except: (1) as an incident to a lawful arrest; (2) when the constitutional immunity has been waived; (3) where an officer has probable cause to believe that an instrument of transportation is carrying contraband or illegal merchandise; and (4) where permitted by a valid legislative enactment." 22 Fla.Law and Practice, Search and Seizures, § 11.
Appellant contends that the above described search was illegal because he had not freely and voluntarily given his consent; lack of consent made the subsequent seizure of incriminating evidence illegal and the evidence in question could not be used against him.
Having carefully read and given full consideration to the briefs and record on appeal, we find that the record did not support the finding that appellant had voluntarily consented to the search and thereby waived his constitutional immunity to search without a warrant. We think the motion to suppress should have been granted.
The constitutional right of the people to be secure in their persons, houses and papers against unreasonable searches and seizures is a fundamental and cherished liberty. This individual right, in recent judicial history, has been given a renewed importance and is zealously protected by the Judiciary. Therefore it is incumbent upon the state to clearly establish a waiver of this right.
"A distinction is recognized * * * between submission to the apparent authority of an officer and unqualified consent. Mere acquiescence in a search is not necessarily a waiver of a valid search warrant. Rather, for an occupant to waive his rights, it must clearly appear that he voluntarily permitted or expressly invited and agreed to the search, being cognizant of his rights in the premises * * *." 47 Am.Jur., Searches and Seizures, § 71.
In Judd v. United States, 89 U.S.App. D.C. 64, 190 F.2d 649, the statement relied upon by the state for consent was summarized as follows: "I have nothing to hide, you can go there and see for yourself." In holding that this did not give consent and that the evidence seized by a subsequent search must be suppressed, the Court stated:
"Conceivably, that is the calm statement of an innocent man; conceivably, again, it is but the false bravado of the small-time criminal. But, however it be characterized, it hardly establishes willing agreement that the officers search the *815 household without first procuring a warrant." Ibid, 190 F.2d 651.
Citing Ray v. United States, 5 Cir., 84 F.2d 654, the Judd case comments:
"[T]he circumstances of the defendant's plight may be such as to make any claim of actual assent `not in accordance with human experience', and explainable only on the basis of `physical or moral compulsion'." Judd v. United States, supra, 190 F.2d at 651.
We feel in consideration of the record in the case sub judice, to hold that a consent to search was freely and voluntarily given would not be "in accord with human experience."
We agree with the holding in Pekar v. United States, where the court stated:
"We think that the decided cases require the conclusion that the agents' superior position to that of the `confused' defendant was the motivating force behind defendant's opening of the door and allowing the agents to `look around' once they were inside." Pekar v. United States, (5 CA 1963) 315 F.2d 319, 325.
Even though appellant did not object to the officers "looking around," this cannot be held as a waiver of his constitutional right to search without a warrant.
The appellee contends it is clearly shown by the record that the appellant voluntarily consented to the search. However, the facts as set forth above in consideration of the requirements discussed herein do not show that appellant consented to this search. For the reasons set forth this case is reversed and remanded for further proceedings not inconsistent with this opinion.
SHANNON, Acting C.J., and PIERCE, J., concur.