UNITED STATES of America,
Plaintiff, Appellee,

v.

Robert ALMONTE, Defendant,
Appellant.

UNITED STATES of America,
Plaintiff, Appellee,

v.

Michael P. RICAPITO, Joseph F. Corrigan, Jr., Defendants, Appellants.

Nos. 77–1539, 77–1540.

United States Court of Appeals,
First Circuit.

Argued Dec. 5, 1978.

Decided Feb. 21, 1979.

John J. Bevilacqua, Providence, R.I., for Robert Almonte, defendant, appellant.

Charles J. Rogers, Jr., Alton W. Wiley, Providence, R.I., and William M. Kunstler, New York City, with whom Jacob R. Evseroff, Brooklyn, N.Y., was on brief, for Michael P. Ricapito and Joseph F. Corrigan, Jr., defendants, appellants.

Edwin J. Gale, Sp. Atty., Dept. of Justice, Providence, R.I., with whom Paul F. Murray, U.S. Atty., Providence, R.I., and Gerald E. McDowell, Sp. Atty., Dept. of Justice, Washington, D.C., were on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

Appellants were convicted of fraudulent possession and sale of counterfeit Federal Reserve Notes and of conspiracy. On appeal, some or all of the appellants challenge the sufficiency of the government's affidavit supporting its application for a wiretap, alleged multiplicity in the conspiracy count, the trial court's refusal to reread large amounts of testimony to the jury, and raise the spectre of prejudicial influences on jurors. We affirm.

The facts of this case, read in the light most favorable to the government, *see*

*United States v. Gabriner,* 571 F.2d 48, 50 (1st Cir. 1978), can be briefly summarized as follows. On November 11, 1976, an undercover Secret Service Agent purchased $3000 in counterfeit $50 dollar bills from appellant Almonte at a tavern in Providence, Rhode Island. On November 18, the agent again met with Almonte and purchased another $7000 in counterfeit $50's. At that time the agent met Almonte's colleague, Hanrahan, who was sent outside the tavern to obtain the bills once the deal was firmed up. On December 23, the agent and another Secret Service man met Almonte at a Holiday Inn in Providence. Almonte took the agents to Hanrahan's home near the tavern, entered the dwelling, and returned with $50,000 in counterfeit $50's.

In order to determine the source of the counterfeit, the government sought and obtained a wiretap order authorizing interception of calls by Almonte and Hanrahan. Meanwhile, the undercover agent began negotiations for a $400,000 purchase of counterfeit. The wiretap soon showed that Almonte obtained his counterfeit from Corrigan and that Corrigan approved Almonte's transactions. Specifically, on January 20, 1977, the agent arranged to purchase another $10,000 in counterfeit from Almonte. Almonte immediately called Corrigan to advise him of the deal. The sale took place on January 21, and, as arranged in a recorded phone conversation, Corrigan arrived shortly after the sale to meet Almonte.

On February 11, the agent ordered $300,000 from Almonte. Almonte immediately called Corrigan, who approved the sale and stated that delivery would be in $100,000 lots. Almonte informed the agent the following morning. The agent expressed extreme displeasure at the staggered delivery, backing out of the deal. Almonte then conferred with Corrigan by phone. Corrigan told Almonte the delivery plans were firm, saying, "we're not doing anything bigger than that." That afternoon, Corrigan called Ricapito to advise him of the status of the group's counterfeit dealings.

After further negotiations between Almonte and the agent, all of which were approved by Corrigan, a deal was struck on February 20 for the purchase and sale of $150,000 two days later. On February 21, Almonte, Hanrahan, and Corrigan met at Corrigan's home. That evening, Corrigan telephoned Ricapito to advise him that the two would probably have to meet the following day, assuming that the buyer's final telephone confirmation was received in the morning.

As agreed, the agent called Almonte on the morning of February 22 to verify the planned purchase. They agreed to meet between 12:30 p. m. and 1:00 p. m. Almonte immediately called Corrigan to indicate that the sale was set. Corrigan told Almonte to have Hanrahan stay at home. Corrigan then called Ricapito to indicate that he would need an additional eleven packages of $10,000 and advised him that the deal was set for one o'clock. Almonte then called Hanrahan and told him to wait at home for Corrigan, who would bring the counterfeit. Hanrahan called Corrigan to confirm his instructions. Corrigan then called Ricapito at his office and arranged to meet there at 11:30 a. m. Ricapito indicated that he had not yet obtained the necessary counterfeit.

At 10:30 a. m., Corrigan left his home carrying a black briefcase and drove off. He was later seen leaving Ricapito's office. Ricapito then left his office carrying the black briefcase. He took it to the home of his girl friend's daughter. Ricapito then drove to his girl friend's beauty shop and placed a brown briefcase in her locked car parked out front. Corrigan then arrived, obtained the keys to the locked car, took out the brown briefcase, and departed.

An hour later, the Secret Service purchased $150,000 in counterfeit from Almonte and Hanrahan at the latter's residence.

Arrests and searches began. The brown briefcase was at Hanrahan's home, empty. The black briefcase left with the daughter of Ricapito's girl friend contained $13,000 in counterfeit and papers belonging to Ricapito. The counterfeit $50's purchased on November 11 and November 18 were identical

to those in the briefcase secreted by Ricapito. All of the counterfeit $50's showed the same cutting blade striations, indicating they were produced by the same counterfeiter. With the exception of the $13,000 found in Ricapito's briefcase, all of the counterfeit bills were packaged in the same way.

Based upon this evidence, the jury returned a verdict of guilty on all counts against all defendants.

### The Wiretap Application

■■■ Appellants Ricapito and Corrigan attack the decision of a district judge to issue an intercept order, arguing that the Secret Service affidavit supporting the application failed to provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be dangerous." 18 U.S.C. § 2518(1)(c). Appellants unsuccessfully moved to suppress the fruits of the wiretap before the trial court.

We think that the affidavit allows us to "decide [that] the facts set forth in the application were minimally adequate to support the determination made" that an intercept order should issue. *United States v. Scibelli,* 549 F.2d 222, 226 (1st Cir.), *cert. denied,* 431 U.S. 960, 97 S.Ct. 2687, 53 L.Ed.2d 278 (1977). A four month investigation of Almonte and Hanrahan preceded the wiretap application. More important, the affidavit recited Almonte's indication that the counterfeit was coming from someone higher up in the chain of distribution and provided the further information that following each of his numerous arrests, starting in 1947, Almonte had refused to cooperate in identifying his suppliers. The location of Almonte's home made physical surveillance to determine his source difficult if not impossible. The allegations setting forth the difficulty in penetrating beyond the retail level in a counterfeit distribution scheme were nothing like the bare conclusory statements of past experience that we abjured in *United States v. DeMuro,* 540 F.2d 503, 510 (1st Cir. 1976), *cert.*

*denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Rather, the affiant set forth that the Secret Service had failed to penetrate past the retail level of the very same counterfeiting ring producing the same bills in other cities. It was reasonable to believe that the secretive organization encountered in other cities was the same organization encountered in Providence, and normal investigative techniques were likely to produce the same failures. Finally, analysis of toll call records had failed to identify Almonte's supplier—a predictable result because there was a central distributor located in Providence.

In sum, the affidavit sufficiently explained why this was an appropriate situation to use wiretaps to locate the source and ultimately the producer of contraband. We are not impressed by appellants' argument that there was no difficulty in obtaining evidence against Almonte and Hanrahan. An investigation of a counterfeiting ring need not stop with the retailers. *United States v. Staino,* 358 F.Supp. 852 (E.D.Pa. 1973). Finally, appellants' objection to the use of wiretap evidence against persons not named in the application is frivolous. Conspirators whose conversations are to be intercepted need only be named if "known". 18 U.S.C. § 2518(1)(b)(iv).

### "Multiple" Conspiracies

■■■ Appellants Ricapito and Corrigan next argue that their conviction for conspiracy was fatally defective because there was no evidence to link them to the pre-wiretap sales of counterfeit. Appellants rely on *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) in arguing further that the unclear and confused evidence of their later involvement was made more convincing by the impermissible implication of their involvement with the earlier sales.

We see the matter differently. As to Corrigan, there was overwhelming evidence from the wiretaps that he was the man controlling Almonte's operation from the beginning. As to both Corrigan and Ricapito, there was sufficient evidence in the na-

ture of the counterfeit, in its consistent packaging, and in the well coordinated and obviously experienced cooperation of the defendants as a distribution team on February 22, for a jury to find beyond a reasonable doubt that all of the sales were made through the medium of a classic chain conspiracy.

Finally, even if we were not convinced that the evidence showed the involvement of Ricapito and Corrigan from the beginning, we could say without hesitation that "[t]his was not a case involving 'the dangers of transference of guilt from one to another across the line separating conspiracies, subconscious or otherwise . . . .'" *United States v. Rivera Diaz,* 538 F.2d 461, 465 (1st Cir. 1976) (*quoting Kotteakos v. United States,* 328 U.S. 750, 774, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). The existence of a single conspiracy having been adequately proven, appellants' further evidentiary arguments also fail.

### Refusal to Reread Testimony

■■■ Appellants next argue that the trial court erred in failing to reread the trial transcript to the jury upon their request. After several hours of deliberation the jury asked to rehear all of the taped telephone conversations and the foreman further stated: "[W]e wanted to know February 22 the timing of all the—the timing of all the events that happened that day, February 22." The trial court conferred with counsel, and all but Corrigan's counsel objected to fulfilling the jury's request. The court expressed its concern that setting forth the timing of events on February 22 would require culling the testimony of a large number of witnesses and would, in effect, make the court a fact finder. The court then acceded to the jury's request to rehear the tapes but denied the request for a review of evidence about "timing".

As an initial matter, we note that appellate counsel for Ricapito and Corrigan urge the application of a plain error standard since only Corrigan objected to the trial court's refusal to read back testimony. We see no plain error. The decision to reread

testimony rests in the sound discretion of the trial court. *United States v. Pollack,* 474 F.2d 828, 832 (2d Cir. 1974). In exercising that discretion, the court can and should take into consideration the reasonableness of the jury's request and the difficulty of complying therewith. *Id.; United States v. Price,* 447 F.2d 23, 31 (2d Cir.), *cert. denied,* 404 U.S. 912, 92 S.Ct. 232, 30 L.Ed.2d 186 (1971). Complying with the request in this case would have required either reading back the testimony of seventeen witnesses or culling the evidence and thereby risking placing undue weight on the evidence reread. *See United States v. Baxter,* 492 F.2d 150, 175 (9th Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 16, 38 L.Ed.2d 38 (1974). We see no error in asking the jury to sort out the facts for itself. Finally, we are unimpressed by appellants' further argument that acceding to the jury's specific and limited request for the tapes placed undue importance on that evidence. The trial court merely granted a reasonable and denied an unreasonable request.

### Jury Impartiality

Appellant Almonte urges two grounds for reversal: first, that the trial court abused its discretion by refusing to excuse the foreman of the jury when he became aware of a contact between another juror and a witness called by the government; and, second, that the court erred by permitting the jury to interrupt their deliberations and return home for an evening when the foreman's wife became ill. Finding no merit to either claim we affirm his conviction.

#### 1. Refusal to excuse the foreman

During the course of the trial, the jury foreman asked to speak to the trial judge. The judge met in chambers with the foreman who informed him that juror Alba had told him that when she and another juror, Antonelli, had left the courthouse the day before, they had seen Ricapito's girl friend, a government witness, wave heartily at Antonelli. Antonelli then remarked that she had recognized the witness when she took the stand as someone who had done her hair

five years ago. Alba also told the foreman that the incident had upset her, and asked him to inform the court.

The court then told counsel of the occurrence, and at their suggestion, interviewed Alba in chambers. She confirmed what the foreman had said and stated that other than Antonelli, the foreman and herself, none of the jurors had been told about the incident. The court advised her not to discuss it with anyone. With agreement of all the parties, the court decided that any corrective action would be delayed until the taking of evidence had been concluded at trial. At that time, upon defense motion, the court excused jurors Antonelli and Alba, although "just out of an abundance of caution", finding "no cause here to remove anybody". He refused to excuse the foreman as also requested by the defense for "[a]ll the man did was deliver the message, he has no connection, no association with the incident whatsoever."

As we stated in *United States v. Doe,* 513 F.2d 709, 711–12 & n. 3 (1st Cir. 1975), if the court finds that a communication between jurors and a third party has occurred, it must determine whether or not it was prejudicial and develop a record that affords "an adequate basis for review". The district court, however, is endowed with considerable discretion in determining the scope and nature of the investigation needed to evaluate the effect of an impermissible jury contact, *see e. g., United States v. Corbin,* 590 F.2d 398, at 400–401 (1st Cir. 1979); *United States v. Boscia,* 573 F.2d 827, 831 (3d Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2248, 56 L.Ed.2d 411 (1978); *United States v. Parker,* 549 F.2d 998, 1000 (5th Cir. 1978); *United States v. Doe, supra,* 513 F.2d at 712, and we find that the court here properly investigated and remedied the incident which was reported to it.

Appellant's attempts to depict the waving incident as highly prejudicial and the foreman's involvement in it as so "intimate" that his continued presence on the jury tainted its deliberations are unpersuasive. The district court's comment that "the whole thing is a gross exaggeration

from beginning to end" strikes us as accurate. No attempt was made by the witness to influence any juror; apparently she and Antonelli did not even speak, and their contact upon leaving the courthouse was completely inadvertent. *Compare United States v. Lubrano,* 529 F.2d 633, 638 (2d Cir. 1975) and *Helmick v. Cupp,* 437 F.2d 321, 322 (9th Cir. 1971) *with United States v. Harry Barfield Co.,* 359 F.2d 120, 124 (5th Cir. 1966). The previous relationship between the two, that of hairdresser and customer, was far from a close one and had occurred some five years before the trial. The foreman did no more than calmly relay the incident second-hand to the court. Finally, counsel's present assertion that "[i]t should have been incumbent on the prosecution to show that [the foreman] remained unaffected by his involvement in the witness/juror communication", is an about-face from his position below. The court offered to call in the foreman and ask, "Now that you have delivered the message, will that in any way affect your deliberations in this case at all?", but counsel requested that he not do so, preferring that the foreman's attention not be called to the incident again. Given the relatively minor nature of this incident and the foreman's tangential involvement in it, the court clearly did not abuse its discretion by refusing to remove him from the jury.

### 2. *Interruption of the jury's deliberations*

Toward the end of the first day of the jury's deliberations, the court was informed that the foreman's wife was ill and upset and wanted him home. Although the jury had been sequestered, the court informed counsel that it believed the appropriate response was to allow the jurors to return to their homes for the night and to reconvene in the morning. The defendants objected, noting that an article appeared in the morning paper about counterfeiting in the area in which the defendants allegedly had been active, and moved for a mistrial. The court denied the motion and called in the jury. In response to the court's questions, the

foreman stated that if he were not permitted to return to his home that evening, his concern "would take my concentration away to some degree", but that if he spent the night at home and returned to court the next day, he had no doubt that he would be able to devote his full concentration to the deliberations. The court then delivered a lengthy and forceful charge to the jury, cautioning them to discuss the case with no one, and to abstain from reading the newspapers either that night or in the morning and from watching television programs or listening to radio broadcasts that "in any way deal with law enforcement". He further informed them they would be placed under oath in the morning and individually questioned about their adherence to his instructions, and dispersed the jury. The next morning, the court followed that procedure, questioning each juror under oath whether he had discussed the case, read, seen or heard anything about this case or anything involving "criminal laws or criminal prosecution or anything of that nature". Each juror responded in the negative.

■ Appellant does note allege any specific prejudice resulting from allowing the jury to separate, nor does he point to any acts of misconduct by the dispersed jurors. Although he notes the supposed existence of a newspaper article on a related subject, there is no suggestion that any of the jurors disregarded the court's instructions, and contrary to their responses under oath, saw or discussed it. See *Cardarella v. United States*, 375 F.2d 222, 227 (8th Cir. 1967). In effect, then, appellant urges us to adopt a rule, apparently consistent with the Seventh Circuit, see *United States v. Panczko*, 353 F.2d 676, 678 (7th Cir. 1965); *United States v. D'Antonio*, 342 F.2d 667, 670 (7th Cir. 1965), but in opposition to every other court of appeals that has addressed the issue, see, e. g., *United States v. Piancone*, 506 F.2d 748, 749–51 (3d Cir. 1974); *Blackmon v. United States*, 474 F.2d 1125, 1126 (6th Cir.), cert. denied, 414 U.S. 912, 94 S.Ct. 252, 38 L.Ed.2d 150 (1973); *United States v. Harris*, 458 F.2d 670, 674–75 (5th Cir.), cert. denied, 409 U.S. 888, 93 S.Ct. 195, 34 L.Ed.2d 145 (1972); *United States v. Esk-*

*ridge*, 456 F.2d 1202, 1205 (9th Cir.), cert. denied, 408 U.S. 926, 92 S.Ct. 2507, 33 L.Ed.2d 338 (1972); *United States v. Siragusa*, 450 F.2d 592, 595 (2d Cir. 1971); *United States v. Weiss*, 431 F.2d 1402, 1407 (10th Cir. 1970); *Cardarella v. United States, supra*, 375 F.2d at 227, that a court must sequester a jury during its deliberations, particularly if the defendant objects to their separation. We decline to do so and thereby join with the majority of the authorities by holding that it lies within the trial judge's discretion to decide whether or not to allow the jury members to disburse before they have completed their deliberations and reached a verdict. We see little to commend a rigid per se rule such as the appellant advocates, which in effect would vest control over the decision to sequester in the defendant rather than the trial court. To the contrary:

> "The problems of prejudicial publicity, possibility of harassment or approaches to jurors, the presence or absence of suitable quarters, and difficulties with local transportation to disperse the jury, emphasize factors which are particularly within the competence of the trial judge to evaluate." *United States v. Piancone, supra*, 506 F.2d at 750.

■ There was no abuse of discretion here. After questioning the foreman, the court examined its options and determined, quite properly we believe, that it was better to allow the sequestered jurors to separate for the night than to compel the foreman, who stated that he could not concentrate fully until he returned home and attended his wife's problems, to continue to deliberate. The court gave thorough cautionary instructions to the jurors and when they returned the next day, questioned each of them under oath about their compliance. Appellant has made no showing whatsoever of any harm occasioned by the separation of the jury, let alone "the gravely prejudicial effect" which he alleges.

Finally, appellant maintains that the "cumulative prejudicial effect" of these two incidents, the contact between a witness

and a juror and the court's refusal to sequester the jury during deliberations, both of which involved the foreman, deprived him of a fair and impartial jury. As we have found no prejudice resulting from either event, their combined effect was insignificant as well.

*Affirmed.*