**Rudy GONZALES, Petitioner-Appellant,**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections, Respondent-Appellee.**

**No. 30918.**

United States Court of Appeals, Fifth Circuit.

June 21, 1971.

Rehearing Denied Aug. 10, 1971.

Simpson, Circuit Judge, dissented and filed opinion and dissented from denial of rehearing.

D. Michael Worley, Lubbock, Tex., for petitioner-appellant.

Allo B. Crow, Asst. Atty. Gen. of Texas, Gilbert J. Pena, Asst. Atty. Gen., Crawford C. Martin, Atty. Gen. of Texas, Nola White, First Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., Robert C. Flowers, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before COLEMAN, SIMPSON and RONEY, Circuit Judges.

COLEMAN, Circuit Judge:

Rudy Gonzales appeals from the denial of the writ of habeas corpus by the United States District Court for the Northern District of Texas. We affirm the judgment of the District Court.

On April 12, 1961, Rudy Gonzales, represented by counsel, was tried in the District Court of Dawson County, Texas, for the murder of Herman L. Curtis. Evidence showed that Gonzales transported two others to a filling station knowing that they were going to rob it. One of them killed Curtis by shooting him twice in the chest with a .22 caliber rifle. Gonzales was convicted by the jury, which fixed his punishment at imprisonment in the state penitentiary for fifty years. Upon appeal, the Texas Court of Criminal Appeals affirmed, 350 S.W.2d 553 (1961).

Over three years later, the Supreme Court decided Turner v. Louisiana, 1965, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424.

Turner had been sentenced to death upon a jury conviction of murder committed during the course of a robbery. Turner's state court trial lasted for three days. Two deputy sheriffs were principal witnesses for the prosecution. One of them testified in detail as to an investigation at the scene of the murder and that upon his arrest Turner had led him and the other deputy witness to a place in the woods where the cartridge clip from the murder weapon was recovered. The second deputy corroborated the finding of the cartridge clip and also told of certain damaging admissions which he said had been made by Turner at the time of his apprehension. Moreover, the second deputy described the circumstances under which he said he had later prevailed upon Turner to make a written confession, which was introduced in evidence.

The jury had been sequestered in charge of the sheriff during the entire three day trial. The testifying deputies drove the jurors to a restaurant for each meal and to their lodging each night. They ate with the jurors, conversed with them, and did errands for them. The deputies "were in this close and contin-

ual association with the jurors". Turner's counsel moved for a mistrial when each of the deputies testified, and established the fact that the testifying deputies had freely mingled and conversed with the jurors in and out of the courthouse during the trial.

The Supreme Court, on certiorari, reversed the conviction, commenting, *inter alia,* that "the potentialities of what went on outside the courtroom during the three days of the trial may well have made these courtroom proceedings little more than a hollow formality", that "even if it could be assumed that the deputies never did discuss the case directly with any members of the jury, it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution".

The Court pointed out, "we deal here not with a brief encounter, but with a continuous and intimate association throughout a three-day trial—an association which gave these witnesses an opportunity, as Simmons [one of the testifying deputies] put it, to renew old friendships and make new acquaintances among the members of the jury". The Court concluded that the relationship between these deputies and the jury "was one which could not but foster the jurors' confidence in those who were their official guardians during the entire period of the trial. And Turner's fate depended upon how much confidence the jury placed in these two witnesses".

This Court on at least three occasions has applied the teachings of *Turner:*

Bowles v. Texas, 5 Cir., 1966, 366 F.2d 734; Crawford v. Beto, 5 Cir., 1967, 385 F.2d 156; and Jackson v. Beto, 5 Cir., 1968, 388 F.2d 409, vacated and remanded on other grounds, 392 U.S. 649, 88 S.Ct. 2290, 20 L.Ed.2d 1350 (1968). No cases applying *Turner* have been found in the decisions of the other federal circuits.

*Bowles* has been convicted in Texas of the murder of his brother-in-law. The denial of habeas relief was affirmed on the ground that the sheriff who had contact with the jury while acting as bailiff had not given testimony sufficiently vital to trigger a *Turner* condemnation, nor had his contact with the jury during the trial been sufficient to deprive the petitioner of an unbiased and impartial jury.

This Court, 366 F.2d at 737, commented:

"A jury that is free from influences outside the courtroom is essential to a fair and impartial trial. As stated in Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751:

'in essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, "indifferent" jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process.'

"This protection against external and unwarranted contact with the jury has been zealously guarded by our courts. Mattox v. United States, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); Pekar v. United States, 315 F.2d 319 (5 Cir. 1963); Ryan v. United States, 89 U.S.App.D.C. 328, 191 F.2d 779 (1951). Cf. United States v. Harry Barfield Co., 359 F.2d 120 (5 Cir. 1966). But as noted by the late Judge Learned Hand in United States v. Compagna (2 Cir. 1945) 146 F.2d 524, 528, it is ' * * * like other rules for conduct of trials, it is not an end in itself; and, while lapses should be closely scrutinized, when it appears with certainty that no harm has been done, it would be the merest pedantry to insist upon procedural regularity.' No less a requirement exists when invoking constitutional sanctions against an otherwise regular state court conviction. Turner v. State of Louisiana [379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424] does not espouse a more stringent test."

In *Crawford,* supra, the denial of relief was affirmed on similar grounds,

with the court commenting, 385 F.2d at 157, "the facts of each case must be examined to determine what impact the officer's testimony may have had on the jury".

In *Jackson*, supra, the denial of relief was again affirmed with the observation, 388 F.2d at 411, that "this court has read *Turner* as limited to situations in which the jury custodian's testimony was central to the development of the case for the prosecution and in which his contact with the jury was continual and intimate".

In the light of these principles, we turn to the facts developed as to Gonzales, the present appellant.

Gonzales received a careful, extended hearing in the court below. The petitioner, represented by counsel, testified. His state court trial attorney testified in behalf of his former client. Also heard were the sheriff who had acted as bailiff to the trial jury, as well as the foreman of that jury. On credibility choices which indisputably were his to make, indeed required of him, the District Judge rejected the testimony on behalf of Gonzales and accepted that given by the sheriff and the jury foreman. In his formal findings, Judge Woodward was moved to comment that he was "particularly impressed by the forthrightness of Mr. McLaughlin", the jury foreman.

The findings of the federal trial judge may be summarized as follows:

1. Gonzales' state court trial lasted one day;

2. The sheriff was an essential witness for the prosecution in that his testimony, although disputed, established the voluntary character of the confession upon which Gonzales was convicted;

3. In accordance with the practice then uniformly prevailing, a procedure not challenged at the time but which has since been expressly prohibited by Texas statutes, the sheriff of the small Texas County of Dawson acted as the bailiff to the trial jury;

4. The sheriff retired the jury to its room a time or two when legal points had to be argued in the absence of the jury;

5. The sheriff conducted the jury to its noon lunch, ate with the jurors, and talked with them about the weather and such subjects, but the case was not mentioned;

6. After the jury retired for its deliberations, it requested refreshments. The sheriff carried soft drinks into the jury room, placed them on the table, and retired forthwith, without conversing with the jury in any manner;

7. The jury found Gonzales guilty on its first ballot (apparently a written, secret ballot) and thereafter settled the sentence.

The District Judge found that the sheriff's "associations with the jury were so minimal that it is extremely unlikely that any prejudice to petitioner could occur", whereupon he denied relief.

We consider this appeal in the light of these findings and in keeping with the teachings of the decisions discussed at the outset of this opinion.

It seems clear to us that in deciding the *Turner* case the Supreme Court was concerned with the fundamental fairness of the fact finding process, which due process of law everywhere requires. The Court laid down no per se proscription of any and all "association" or "contact" between a testifying officer and the trial jury. It did make it crystal clear that continuous, extended association over a period of three days was per se indefensible. It served notice that any association of the forbidden type which could prejudice the chances of a defendant to a fair trial cannot stand. This means, to avoid the question, that trial judges should never leave sequestered juries to the custody of an officer who has given vital testimony in the case.

Upon consideration of the appeal now before us, we find ourselves unable to generate a feeling, supported by reason,

that openly and publicly conducting a jury of twelve men and women to one noon-time lunch prejudiced the Gonzales jury or affected the fundamental fairness of his trial.

The courtroom contacts were public and directly under the supervision of the trial judge. They were of the same nature as the public, supervised appearance on the witness stand. They told the jury no more than what they already knew, that Mr. Mayfield was the sheriff of the county and the chief executive officer of the court.

There was no day and night contact here, with constant communication between the officer and the jurors, including eating many meals together, the delivery of messages, and the running of errands, as in *Turner*. To be taken to lunch by the sheriff in the middle of the day while a trial was in progress, and the jury could not be allowed to separate, was the known and expected procedure. No witness has come forward to say that there was the slightest impropriety in what the sheriff said to the jurors while taking them to the noon meal. There is specific testimony to the contrary, and that testimony is undisputed. If Gonzales and his attorney had any contemporaneous feeling of prejudice they uttered no objection; whereas in *Turner* the attorneys repeatedly objected and moved for mistrials.

We are compelled to agree with the District Court that the facts of this case establish no prejudice to the fundamental fairness of Gonzales' state court trial. The judgment below is

Affirmed.

SIMPSON, Circuit Judge (dissenting):

With deference to the views of my colleagues, I dissent.

Although there are of course slight differences in the facts between this case and *Turner* [1] I find none of these to be significant. For instance, in *Turner* the trial lasted three days, here

it lasted one. In *Turner* the jury was attended by two deputy sheriffs, here it was attended by the Sheriff, an elected official. It may be argued pro and con as to whether the jury would be more likely to be influenced by the attendance of the Sheriff than by the attendance of deputies as in *Turner*, but equally as with *Turner* this petitioner's "fate depended upon how much confidence the jury placed in" the Sheriff. As emphasized by Mr. Justice Clark's dissent in *Turner* (379 U.S. at 474, 85 S.Ct. at 550) actual prejudice was not demonstrated in *Turner*, so that the failure to demonstrate prejudice should not be controlling here. In this case, as shown by the trial court's findings, Sheriff Mayfield acted as jury bailiff, he was the key prosecution witness in that he took the stand and laid the predicate for the submission of the petitioner's confession, he took the jury to lunch and ate with them, he talked with the jurors during lunch and during the jury's deliberation he took soft drinks into the jury room at the jury's request. To me the twin tests of *Turner* were met: (1) the jury custodian's testimony was central to the development of the prosecution's case, and (2) his contact with the jury was continual and intimate. In Jackson v. Beto, 5 Cir. 1968, 388 F.2d 409, vacated and remanded on other grounds 392 U.S. 649, 88 S.Ct. 2290, 20 L.Ed.2d 1350 (1968), we distinguished *Turner* by saying that the Sheriff there was neither a principal witness nor did he have any contact with the jury other than in the courtroom. In this case, to the contrary, the Sheriff was the state's key witness and his contact was continual and intimate throughout the trial and considerably more extensive than simply in the courtroom. He took the jury to lunch, he ate lunch with them and visited with them and returned them to the courthouse from lunch. He was in the jury room briefly delivering soft drinks during actual deliberation of the jury. I would not hesitate to hold that the *Turner* rule is applicable here.

1. Turner v. Louisiana, 1965, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424.

Since *Turner* was decided January 18, 1965, and the present trial was on April 12, 1961, the question of whether *Turner* should be retroactively applied arises. The Supreme Court in Linkletter v. Walker, 1965, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed. 601, fixed the standards for determination of retroactive application by setting forth three tests: the purpose of the new decision or standard, the extent of reliance on the old standard, and the effect of retroactivity on the administration of justice. Concern was indicated at anything which might affect the "fundamental fairness of the fact-finding process". Certainly the fundamental fairness of the fact-finding process is directly involved here.

With respect to the *Linkletter* standards I would say that the *Turner* rule was adopted to meet the minimal requirements of Due Process of Law, that the extent of reliance on the old rule would be minimal and that the effect of retroactivity on the administration of justice would likewise be minimal. The latter statement is based upon two considerations: (1) the practice indulged in here is now forbidden by statute in Texas, Vernon's Ann.Tex.C.C.P. Art. 36.-24, effective January 1, 1966, and (2) the fact that since *Turner* was decided in 1965 this Court has been called on to decide *Turner*-type questions in only three cases: Bowles v. Texas, 5 Cir. 1966, 366 F.2d 734, Crawford v. Beto, 5 Cir. 1967, 385 F.2d 156, and Jackson v. Beto, 5 Cir. 1968, 388 F.2d 409.

To recapitulate, I would hold *Turner* applicable to the facts in this case and would hold that *Turner* should be given retroactive application so as to reach this case under *Linkletter* standards. These considerations impel my dissent.

## ON PETITION FOR REHEARING

### PER CURIAM:

It is ordered that the petition for rehearing filed in the above entitled and numbered cause be and the same is hereby denied.

SIMPSON, Circuit Judge (dissenting):

For the reasons outlined in my dissent to the majority opinion, I respectfully dissent from the order denying petition for rehearing.