UNITED STATES of America, Appellee,

v.

Alfred ARGENTINE,
Defendant, Appellant.

Nos. 85–1917, 85–1918.

United States Court of Appeals,
First Circuit.

Argued Jan. 7, 1987.

Decided March 20, 1987.

784

Marc Bogatin, with whom Stanley S. Arkin, P.C., New York City, was on brief, for defendant, appellant.

David R. Collins, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., Portland, Me., was on brief, for appellee.

Before COFFIN, Circuit Judge, ROSENN,* Senior Circuit Judge, and SELYA, Circuit Judge.

SELYA, Circuit Judge.

Alfred Argentine appeals both his conviction on three counts of wire fraud, 18 U.S.C. § 1343, and his conviction on a charge of willful failure to appear at a pretrial hearing, 18 U.S.C. § 3150 (repealed). We reach only those issues which must be considered in order to permit proper disposition of these appeals, and we recount the facts only to the extent necessary to place appellate proceedings into proper perspective.

## I.

On August 25, 1983, the appellant was indicted by a grand jury in the United States District Court for the District of Maine. He was charged with seven counts of wire fraud in violation of 18 U.S.C. § 1343.[1] The heart of the indictment was the accusation that Argentine, who was then managing the Oar House, a seafood restaurant in New York, devised an elaborate scheme to gull Atwood Brothers, Inc. (Atwood), a Maine firm. The essence of the plan, the grand jury alleged, was Argentine's arrangement to have Atwood, a lobster wholesaler, ship 20,000 pounds of the succulent delicacy from Maine to New York, under the false pretense that payment (in the form of a corporate check) would be forthcoming promptly. The purported payor in this "the-check-is-in-the-mail" gambit was to have been Clamico, Inc. (Clamico), proprietor of the Oar House and as such, Argentine's employer. The prosecution limned the appellant's role as comprising, for purposes of the federal criminal code, interstate telephone calls on seven different dates in furtherance of the scam. Each call was alleged to have been a part of the continuing artifice, though separately actionable under the statute.

Following his arraignment, Argentine was admitted to bail pursuant to the provisions of 18 U.S.C. § 3146(a). On February 10, 1984, however, he neglected to appear at a pretrial hearing connected with the case, and so became a fugitive from justice. He was eventually apprehended some eight months later, and indicted on a single count of willful failure to appear—"bail-jumping," in the vernacular—in violation of 18 U.S.C. § 3150 (repealed).

Argentine chose to represent himself, assisted by court-appointed standby counsel (Rose Duggan). He was tried before a jury on the original indictment, with mixed results. The jury heard evidence from witnesses who described the appellant's prominent participation in promoting the interstate lobster shipment and in deflecting Atwood's inquiries as to the promised payment. It is unnecessary for our purposes

---

* Of the Third Circuit, sitting by designation.

1. This statute criminalizes "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... by means of wire, radio, or television communication in interstate or foreign commerce...." 18 U.S.C. § 1343.

to restate the details of this chicanery. It suffices to note that Charles O'Brien (an intermediary for Clamico) testified that the defendant instructed O'Brien to place an order for 20,000 pounds of lobster, and pledged that a check for some $53,000, to cover same, was being sent instanter to a Maine bank.

On May 26, 1981, with lobsters at the ready but the anticipated payment from Clamico not in sight, O'Brien testified that he called Argentine—who blithely assured him that the funds had been transferred and would be arriving "any minute." O'Brien further swore that the defendant telephoned him a second time that day, again affirming that the money was on its way. Based on these avouchments, O'Brien gave Atwood's president, Virginia Larsen, a check drawn on the Maine bank, to hold as a kind of security. (O'Brien's check was a token of good faith only; unless and until Clamico's capital arrived, O'Brien's paper would not be worth the powder and shot.) Larsen, thus mollified, released the lobster shipment.

Mrs. Larsen no longer had the lobsters—and she was not to receive the pelf. She testified that she spoke with Argentine on May 27th, 28th, and 29th, each time receiving some (lame) excuse as to the nonappearance of the funds. And her son, David, apparently spoke with Argentine thereafter, with similar (non)results. O'Brien's votive check proved to be nonnegotiable, inasmuch as no funds were deposited by Argentine or Clamico to back it up. To make a tawdry tale tolerably terse, Atwood never received a nickel for its lobsters. Mrs. Larsen (understandably) cried "foul," the matter went before the grand jury, and a true bill ensued.

The trial lasted less than two days. At the close of the case, the jury retired to consider the seven count indictment in light of the evidence adduced. All of the telephone calls between the appellant, on the one hand, and O'Brien and the two Larsens (mother and son), on the second hand, had

been interstate. The indictment charged that the purchase of the crustaceans was, from its inception, a scheme to defraud, and that in furtherance of this cozenage Argentine had perpetrated wire fraud on each of the following dates: May 26, 27, 28, 29, June 3, 4, and 5, all 1981. During its deliberations, however, the jury sent the following note to Judge Porter:

> We would like to know what dates Mrs. Larsen talked to Mr. Argentine. Also her son David, dates.

The judge then conferred with the prosecutor, the defendant, and the defendant's standby counsel, in chambers but on the record. After some preliminary discussions, the following request was made by Attorney Duggan:

> Well, your Honor, I think we're going to have a [sic] to have a transcript of the testimony. I don't think it's our testimony that we should rely on.

When the judge began to ruminate as to his recollection of how the testimony went, standby counsel pointedly observed:

> It was some confusion, your Honor, as to what Mr. O'Brien told her Mr. Argentine had said, so I think we're going to have to have the testimony.

Thus, the lawyer requested—at least twice [2]—that the response to the jury's inquiry be accomplished by reading back the pertinent testimony. After expressing a tentative willingness to accommodate this entreaty, however, the trial judge concluded that he would take matters at least partially into his own hands, stating:

> I'm going to tell [the jury foreman] the 26th and 28 [sic], and on the 28th I'm just going to have [the court reporter] read that portion, and leave it up to them if there was a call on the 28th as to the son. I'm going to tell them he testified it was two or three days after the transaction.

The protagonists debouched into open court, where Judge Porter told the jurors:

---

**2.** It appears from the transcript of the chambers conference that Attorney Duggan was in the process of making yet a third supplication when

the district judge cut her off and made his decision not to have the testimony reread.

You wanted to know the dates Mrs. Larsen talked to Mr. Argentine, also her son, David. We've checked the record.

Mrs. Argentine (sic) talked to him on the 27th and the 29th, and in between her testimony about what she said on the 27th and 29, there's a little record that is not real clear, and we're going to have to leave it up to you to determine whether she also—from the reading of the record, as to whether or not there was also a conversation on the 28th. She did talk on the 27th and 29th, and I'm going to ask the reporter to read the part of her testimony in between what she said, and what he said, on those two dates, to see whether—and leave it up to you to decide whether she—they also had a conversation on the 28th. Okay?

The court reporter then read the testimonial excerpt, whereupon the court added:

And as far as her son, he testified he talked to Mr. Argentine two or three days after the transaction.

As soon as the jury retired to resume deliberations, Attorney Duggan voiced her objection. She opined that the procedure which the court had utilized was misleading, and reaffirmed the defense's position that "[t]he entire testimony of Mrs. Larsen should have been read so [the jury] could have made a factual determination." The objection was overruled.

Eventually, verdicts were returned. The jury acquitted the defendant on four of the counts, but found him guilty on counts 2, 3, and 4 (relating to the telephone calls of May 27, 28, and 29, respectively). Subsequent to the rendition of these verdicts but prior to the imposition of sentence, Argentine pled guilty to willful failure to appear at the February 10, 1984 pretrial hearing. When the plea was taken by Judge Carter (who had not presided at the wire fraud trial) on September 23, the government acknowledged that its oral bargain with Argentine on the bailjumping charge included a promise to "stand silent at the time of

sentencing and make no recommendation to the Court."

On October 18, 1985, Judge Carter held a sentencing hearing which spanned all of the convictions. At this session, the prosecutor—who was, of course, under no inhibition with respect to his recommendations anent the wire fraud convictions—made telling mention of Argentine's prodigious record of criminal activity. He then pointed out the defendant's failure to have made restitution for Atwood's large loss. The prosecutor concluded that,

[u]nder these circumstances, the government feels and recommends to the Court that a significant prison term is appropriate of at least five years and suggests to the Court that the bailjumping charge on which he also stands convicted could be part of that as part of a concurrent disposition of the case.

Neither the appellant nor his standby counsel protested at the time this reference was made. To the contrary, immediately after the Assistant United States Attorney had finished his remarks, Duggan and Argentine each spoke in mitigation of punishment without mentioning in any way the casual allusion to the bail-jumping charge. When the allocution was completed, Judge Carter sentenced Argentine to concurrent three year prison terms on each of the wire fraud counts and to an additional three years of imprisonment on the bail-jumping charge (consecutive to the wire fraud sentences). These consolidated appeals followed.

## II.

The appellant challenges his wire fraud convictions on a trio of grounds. But, inasmuch as we find that the trial court's substantive response to the jurors' question during the period of deliberations impermissibly trespassed upon the jury's fact-finding prerogative, we need not dwell upon the remaining arguments.[3]

The record makes plain that the jury's query concerning the dates of the supposed

---

3. Both of the other assignments of trial error involved idiocratic situations unlikely to recur in a retrial of the case.

conversations was directed to an essential element of the offenses for which Argentine was indicted—that is, his participation *vel non* in interstate telephone calls regarding the suspect shipment. Though the appellant, as was his right, had declined to testify—and thus, had not explicitly denied his role in the calls—the burden of proof nevertheless remained with the government. Significantly, the trial judge's handling of the jury question relieved the prosecution of that burden in an unfair way: the court's response to the question left no room for the jury to believe anything but that Argentine's conversations with Virginia Larsen on May 27 and May 29 were conclusively established.

The vice inherent in the court's actions was three-fold. First, there was no apparent cause for the trial judge to have declined counsel's exhortations to have the critical testimony read to the jury. The question was reasonably well-focused, the court reporter had been able to locate the relevant portions of the testimony, and there was no evident physical or logistic impairment to reading it. Moreover, there is no suggestion that a read-back would have consumed an inordinate amount of time.[4] In the case at bar, the scales plainly tipped toward accession to the reiterated read-back requests.

■ We would not, however, reverse a district judge under circumstances like these merely for failing to have testimony reread, without more. A judge need not always defer to a deliberating jury's desire to have testimony repeated, or to a lawyer's beseechment that a verbatim reprise of trial testimony be undertaken as a means of answering a jury's question. We recognize that "[t]he decision to reread testimony rests in the sound discretion of the trial court," *United States v. Almonte*, 594 F.2d 261, 265 (1st Cir.1979), and we will not disturb the exercise of that discretion without good reason. Yet here, other miscues, in combination with the refusal to read back the testimony, skewed the balance to an intolerable extent.

■ The second of the vices which we perceive is itself more pivotal. Having failed to honor the bid to have the testimony reread, the court began its response to the jury with the observation that *"We've checked the record"* (emphasis added). Fairly viewed, this was neither the royal "we," nor the editorial "we": given the setting, the use of the first person plural could only be taken to imply that all of the parties in interest—the judge, the court stenographer, the prosecutor, the defendant, and standby counsel—had "checked the record" as a team, and were collectively vouching for what followed, *viz.*, for the important fact that "Mrs. Argentine (sic)[5] talked to [the defendant] on the 27th and the 29th...."

This was the third vice. Note that the judge did not tell the jury that such was the witness's testimony; rather, he presented it to the jurors as an accomplished fact, a fact prescinding from the collaborative "check[ing of] the record." The court then compounded the third vice by telling the veniremen that an ambiguity in the record required them to determine "whether or not there was *also* a conversation on the 28th" (emphasis added), thereby reinforcing the certitude of the judge's factfinding regarding the other two calls. Assessing the response to the jury's question in its totality, it becomes painfully evident that the judge, in words, substance and effect, unwittingly mandated that certain facts—central to the prosecution's

---

4. We appreciate that time is a highly relevant factor in such a calculus, not only from the standpoint of appropriate conservation of judicial resources (where that can be accomplished without endangerment of the parties' rights), but also because jurors, forced to listen endlessly to a court reporter drone on and on, are less apt to comprehend and evaluate what is being read to them. There is considerable truth, and obvious pertinence in the present context, to the adage that the mind can absorb only what the seat can endure.

5. This obvious *lapsus linguae* was plainly meant to refer to Mrs. Larsen; as counsel conceded in their briefs and at oral argument, the jury must have interpreted it in that fashion. Indeed, the indication of the slip of the tongue—"(sic)"—appears in the original trial transcript, adequately evincing universal recognition of the bevue.

case—be taken as true. In fine, the jurors were instructed to accept the premise that Argentine had spoken with Mrs. Larsen on May 27 and again on May 29.

The government's assertion that these matters were undisputed, thus legitimating the court's pronouncements, misses the point. Although the evidence may not have been directly contradicted by conflicting evidence, it is nonetheless settled, in a criminal case, that "[t]he plea of not guilty places every issue in doubt, and not even undisputed fact may be removed from the jury's consideration, either by direction or by omission in the charge." *United States v. Natale*, 526 F.2d 1160, 1167 (2d Cir. 1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976). *Accord United States v. Johnson*, 718 F.2d 1317, 1322 (5th Cir.1983). As we phrased it in *Flaherty v. United States*, 355 F.2d 924, 926 (1st Cir.1966), "all issues not affirmatively conceded are 'disputed' on a plea of not guilty." We have held before—and today reaffirm—that "[n]o matter how persuasive the government's evidence may seem to the court, there is no burden on a defendant to dispute it. Nor can defendant's failure to offer evidence on [an] issue change or satisfy the government's burden with respect to it." *DeCecco v. United States*, 338 F.2d 797, 798 (1st Cir.1964). *Accord Moore v. United States*, 429 U.S. 20, 22, 97 S.Ct. 29, 30, 50 L.Ed.2d 25 (1976) (per curiam) (prosecution bears "the burden of proving beyond a reasonable doubt every element of the charged offense").

The Constitution casts judge and jury in mutually supporting—yet nevertheless distinct—roles. Undeniably inherent in the constitutional guarantee of trial by jury is the principle that a court may not step in and direct a finding of contested fact in favor of the prosecution "regardless of how overwhelmingly the evidence may point in that direction. The trial judge is ... barred from attempting to override or interfere with the jurors' independent judgment in a manner contrary to the interests of the accused." *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 573, 97 S.Ct. 1349, 1355, 51 L.Ed.2d 642 (1977). Judge Aldrich has eloquently captured the

essence of the point: "Put simply, the right to be tried by a jury of one's peers finally exacted from the king would be meaningless if the king's judges could call the turn." *United States v. Spock*, 416 F.2d 165, 181 (1st Cir.1969) (footnote omitted) (citing *Bushel's Case*, 124 Eng.Rep. 1006 (C.P.1670)). Here, the trial court impermissibly "call[ed] the turn;" it rewrote the script and took center stage in the adjudicatory drama, well beyond the character of its part. In so doing, the court penetrated the private precincts of the sitting jury and, in the bargain, transgressed the appellant's sixth and seventh amendment rights.

We are convinced that, notwithstanding the ample evidence from which the jury could have concluded that Argentine dealt fraudulently with Atwood, the erroneous removal of fundamental questions of fact from the jury's consideration cannot easily be countenanced. Whatever probative force the government's proof possessed, the jury had the power to accept or reject it—or to find it insufficiently persuasive. The defendant had a correlative right to the free and unhampered exercise by the jury of all of its powers. The court below significantly narrowed the latitude which the jury—and therefore, the defendant—should have enjoyed in this respect. By telling the jurors that the appellant had participated in telephone conversations with Mrs. Larsen on particular dates, conclusively establishing these contested facts as a matter of record, the court "permitted the jury to convict [the defendant] without ever examining the evidence concerning an element of the crimes charged." *Connecticut v. Johnson*, 460 U.S. 73, 88, 103 S.Ct. 969, 978, 74 L.Ed.2d 823 (1983). *See also United States v. Singleton*, 532 F.2d 199, 206–07 (2d Cir.1976) (court's statement that "it would seem clear ... that these checks ... were recently stolen" constituted reversible error because essential element of offense removed from jury's purview).

### III.

■ Having ascertained error in this regard, our next inquiry must be whether or not the error is such that it requires us to

reverse the convictions on some or all of the wire fraud counts. That inquiry, in turn, necessitates consideration of whether or not the mistake can be termed "harmless." When it is determined on appeal that an error at trial compromised the defendant's constitutional rights, the defendant need not demonstrate actual prejudice. A reasonable possibility of mortal injury attributable to the error warrants reversal.

In *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963), the Court vacated a criminal conviction which rested in part on unconstitutionally obtained evidence. "We are not concerned here with whether there was sufficient evidence on which the petitioner could have been convicted without the evidence complained of. The question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Accord Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967) (explicitly approving the "reasonable possibility" standard announced in *Fahy* ). *See also United States v. Herbert*, 698 F.2d 981, 986 (9th Cir.) (reversal warranted "only if there is error and there is a reasonable possibility that error materially affected the verdict"), *cert. denied*, 464 U.S. 821, 104 S.Ct. 87, 78 L.Ed.2d 95 (1983); *Miller v. North Carolina*, 583 F.2d 701, 707 (4th Cir.1978) (error not harmless "unless the reviewing court were able to say, beyond a reasonable doubt, that there was no possibility that the disputed evidence might have contributed to the conviction"); W. LaFave & J. Israel, *Criminal Procedure* § 26.6 at 264 & n. 55 (1984) (similar). *Cf. United States v. Norton*, 808 F.2d 908, 911 (1st Cir.1987) (citing *Herbert* with approval).

■ It is not enough that there was evidence before the jury from which Argentine's guilt could reasonably be deduced. *See Rose v. Clark*, —— U.S. ——, 106 S.Ct. 3101, 3106, 92 L.Ed.2d 460 (1986) (the government cannot contend that deprivation of the right to trial by jury was harmless simply because the evidence established the defendant's guilt). Nor is it enough that this evidence seems strong to

us. *Fahy, Chapman*, and their progeny plainly eschew a "correct result" test. The existence of some reasonable possibility that error of constitutional dimension influenced the jury in reaching a verdict—a reasonable possibility as opposed to one that is fanciful, chimerical, or purely speculative—demands that a conviction be vacated. This approach is, of course, consistent with such essential hallmarks of our criminal justice system as the presumption of innocence and the allocation and quantum of the burden of proof. As with guilt or nonguilt, if reasonable doubt persists as to the harmlessness of such error, the accused should have the benefit of it.

We apply these principles to the case at hand. The calculus of prejudice is easier to formulate as to counts 2 and 4. Those counts, after all, involved alleged misdeeds on May 27 and May 29, respectively, so the judge's invasion of the factfinders' province had a direct impact. The jury apparently regarded this case as a close call. As we have mentioned, Argentine was acquitted on four of the seven counts charged. The jury voted to acquit on count 1 (wire fraud on May 26) despite having heard testimony from O'Brien that Argentine, during a telephone conversation on that date, induced him to have Atwood ship the lobsters. They likewise found the defendant not guilty on counts 5, 6, and 7 (which related to events which allegedly transpired during the period June 3–5, 1981). It strikes us as no coincidence that Argentine was convicted for wire fraud violations occurring on precisely the dates given the jury by the trial judge. So, in a case where particular dates were so evidently important to the factfinders, it becomes surpassingly difficult to view the error which occurred here as inconsequential.

The matter is less clear as to count 3. Although the appellant has argued to the contrary, Judge Porter did not direct the jury to make any particular finding as to the putative May 28 telephone call. And, there was arguably untainted evidence sufficient to convict on this count. The question is excruciatingly close—so close that justice requires that we resolve it in favor of the accused. We believe that there is

too great a risk that the lower court's inculpating comments with respect to the May 27 and May 29 communications likely tainted further consideration of this count. Those calls bracketed count 3 both in a temporal sense and in an oratorical sense; the judge's comments on them were delivered virtually in conjunction with the court's discussion of count 3. The three dates were effectively grouped. The circumstances invited treatment of the events of May 27–28–29 as a seamless web. This juxtaposition poses too great a spillover hazard to be acceptable. Given the imbrication, we cannot feel confident that the jury was so discerning as to view impartially a bracketed call of this sort.

The existence of the requisite "reasonable possibility" of harm is made the more plausible in this instance by the timing of the breach. The error occurred at the most critical stage of the trial, in the midst of the jury's deliberations. As Justice Frankfurter wrote some four decades ago:

> Particularly in a criminal trial, the judge's last word is apt to be the decisive word.

*Bollenbach v. United States*, 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946).

We conclude that the court below committed reversible error in furnishing substantive responses to the jury's request for factual information. *See United States v. Hyson*, 721 F.2d 856, 865 (1st Cir.1983) (approving district judge's refusal to answer a jury's factual question because to do so "would be turning the whole role of the Court and the jury on its head....."). For this reason, the defendant's convictions on the three counts of wire fraud cannot stand.

## IV.

We need not linger long in our consideration of appellant's challenge to the sentence he received for the bail-jump. Argentine contends that the government broke its promise to make no recommendation to the court on this charge at the time of sentencing. The argument, however, is as barren as a wintry plain.

■ The defendant did not object to consolidation of the sentencing proceedings. As noted *ante*, the prosecutor's lone reference thereat to the willful nonappearance charge took the form of an offhand suggestion that the court treat this conviction, for purposes of sentencing, as "part of a concurrent disposition of the case." The government had already entered a recommendation for imposition of sentence on the wire fraud convictions—a recommendation which the prosecutor was fully at liberty to voice, as that subject was not touched upon by any antecedent plea agreement. The record makes clear that the sentencing judge, who had presided at the change-of-plea hearing, had been apprised of the government's commitment to offer no recommendation vis-a-vis sanctions on the § 3150 indictment. Far from attempting to exacerbate Argentine's sentence for failing to appear, the prosecution essentially reminded the court that it was not urging any distinct or separate punishment for this offense. Under these circumstances, we find that the prosecutor's allocution can most logically be construed as a recommendation for lenity on the bail-jumping charge, and that such a recommendation was altogether consistent with the government's plea-bargained obligation to seek no additional punishment for that conviction.

■ It is possible, as Argentine implores, to find some ambiguity in the remark. Yet, even if the commentary was susceptible to some other interpretation, and the government arguably violated the terms of the oral plea agreement, it avails the appellant naught. The defendant would have had a duty to call the supposed breach to the district judge's attention when it occurred. Judge Carter would then have been in a position to clarify any ambiguity, or alternatively, to provide such redress as might be appropriate to remedy the situation. *Cf. Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 498, 30 L.Ed.2d 427 (1971). Having neglected this duty, and having opted instead to await the imposition of sentence in the hope that the suggestion voiced by the prosecutor would be adopted, the appellant forfeited any right to appeal on this ground. "We are an

appellate tribunal, not a *nisi prius* court...." *United States v. Kobrosky*, 711 F.2d 449, 457 (1st Cir.1983). It is not our role to use second sight when parties have maneuvered to deprive the district judge of an initial glimpse of the putative problem. "[A]n issue not presented to the trial court cannot be raised for the first time on appeal." *Nogueira v. United States*, 683 F.2d 576, 580 (1st Cir.1982) (quoting *Johnston v. Holiday Inns, Inc.*, 595 F.2d 890, 894 (1st Cir.1979)).

For these reasons, we reject the appellant's protest to the imposition of sentence on his conviction for willfully failing to appear.

*The appeal in No. 85–1917 is sustained, the convictions are vacated, and the case is remanded to the district court for a new trial.*

*The appeal in No. 85–1918 is rejected, and the conviction therein is affirmed.*