# United States Court of Appeals
## For the First Circuit

No. 22-1075

UNITED STATES OF AMERICA,

Appellee,

v.

MARK MOFFETT,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William D. Young, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Michael Pabian, with whom Martin G. Weinberg was on brief,
for appellant.
Karen L. Eisenstadt, Assistant United States Attorney, with
whom Rachael S. Rollins, United States Attorney, was on brief, for
appellee.

November 18, 2022

**BARRON, <u>Chief Judge</u>**.  Mark Moffett was charged in 2019 in the United States District Court for the District of Massachusetts with nine counts of wire fraud and six counts of aggravated identity theft for his participation in an alleged health insurance fraud scheme.  After a ten-day jury trial, he was convicted on all counts.  Moffett contends in this appeal that the convictions must be vacated on a number of distinct grounds, including the one that we conclude is decisive -- namely, that the verdict form that was submitted to the jury violated Moffett's federal constitutional right to a jury trial by expressly referring to certain trial exhibits that the government alone selected while not otherwise referring to any of the evidence in the case.

## I.

Moffett joined Aegerion, a Cambridge, Massachusetts-based pharmaceutical company, as a sales representative in 2014. The company at that time promoted and sold a cholesterol-lowering drug, "Juxtapid."  The sticker price for Juxtapid was as high as several hundreds of thousands of dollars per patient, per year. For each "sale" of the drug, sales representatives for Aegerion like Moffett received a bonus.

The U.S. Food and Drug Administration ("FDA") as of that time had approved Juxtapid only for the treatment of a specific disease, homozygous familial hypercholesterolemia ("HoFH").  Many health insurance companies in turn had approved coverage for

Juxtapid only if it had been prescribed to a patient to treat a qualifying HoFH diagnosis. Moffett often assisted doctors and their offices with completing health insurance paperwork, including documents necessary to demonstrate the requisite indication of such a diagnosis so that a prescription for Juxtapid would be covered by the patient's insurance.

In 2019, a federal grand jury in the District of Massachusetts indicted Moffett on nine counts of wire fraud under 18 U.S.C. § 1343 and six counts of aggravated identity theft under 18 U.S.C. § 1028A.[1] The indictment alleged that Moffett "devised . . . a scheme and artifice to defraud, and to obtain money from health insurance companies to pay [Aegerion] for [Juxtapid] by falsely representing that patients for whom doctors had prescribed [the drug] met the health insurance companies' coverage criteria."

---

[1] The wire fraud statute, 18 U.S.C. § 1343, provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings . . . for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both."

The aggravated identity theft statute, 18 U.S.C. § 1028A, as relevant here, provides that "[w]hoever, during and in relation to [a wire fraud offense], knowingly . . . uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."

A ten-day jury trial was held in the District of Massachusetts in December 2019. The government introduced evidence at trial of communications that it claimed included false statements about patient diagnoses that had been submitted to health insurers to obtain reimbursement from them for prescriptions for Juxtapid. The government also put on witnesses -- including five doctors and some of their staff members -- to show that Moffett made or caused those false statements to be made regarding the diagnoses of the patients for whom Juxtapid had been prescribed and for which reimbursement from the health insurers had been sought.

According to the government, Moffett's alleged false statements on the insurance documents were communicated to health insurers through "wires." 18 U.S.C. § 1343. The government also alleged that Moffett included the doctors' identifying information on some of those documents in a manner that constituted the unauthorized "uses" of that identifying information for purposes of the federal statute that makes identity theft a crime. 18 U.S.C. § 1028A.

Moffett introduced evidence at trial of email exchanges with doctors that he argued demonstrated that they were aware of the only approved use of Juxtapid and that he did not actually encourage "off label" prescriptions for that drug. He also elicited testimony for the purpose of impugning the credibility of

- 4 -

the witnesses whose testimony tended to suggest that Moffett added false information or signatures to insurance letters and authorization forms. He further introduced evidence that sought to show that at least some of the doctors personally approved and signed the allegedly fraudulent documents.

On the second day of trial, after the jury had been dismissed, the District Court informed the parties that it had been working on a verdict form to give to the jury that would "organize[] the case in a logical foundation." The next day the District Court provided the parties with the draft verdict form and invited the government to select an exhibit that constituted the alleged "wire" for each of the wire fraud counts, as well as an exhibit that constituted the alleged "use" for each of the "identity theft" counts, so that the selected exhibit could be identified on the verdict form in relation to the relevant count. The government obliged.

Moffett objected both orally and in a written filing to the proposed verdict form insofar as it would reference the government-selected exhibits.[2] Moffett argued that if the District Court submitted to the jury such a verdict form, then the District Court would be "invading the province of the jury to

_____

[2] Moffett also objected to the District Court's decision to re-order the counts on the verdict form, but he does not press that theory of error on appeal, and we therefore do not address it.

deliberate how it wants to deliberate and . . . relieving the government of [its] burden" to "identify and prove which communications are the subject of the various counts in the indictment without assistance from the court or suggestion from the verdict slip."  Moffett proposed that the District Court instead provide the jury a verdict form that did not list any exhibits.  The District Court denied the objection, noting that "[y]our rights are saved, but we're going to use the verdict slip as [the District Court] proposed it."

Five of the nine exhibits that the government selected to support the wire fraud counts contained the document that the government alleged Moffett had faxed to insurance companies (Counts 3, 4, 7, 8, and 9), two of the nine exhibits contained emails that Moffett had sent about new Juxtapid prescriptions (Counts 5 and 6), and the other two exhibits contained "[s]creen shots" of Aegerion's salesforce.com account showing data entries about various communications between Aegerion and insurance companies (Counts 1 and 2).

Each of the six aggravated identity theft counts was based on an alleged use of a doctor's identifying information in an insurance document associated with one of the faxes or emails that the government alleged constituted a fraudulent wire.  Thus, the exhibits selected by the government to support the aggravated identity theft counts -- except for one -- were the same exhibits

- 6 -

that it had selected to support the corresponding wire fraud counts (Counts 10, 11, 13, 14, and 15).

The other exhibit referenced on the verdict form that had been selected by the government pertained to Count 12. This exhibit contained an insurance authorization form that Moffett had allegedly faxed and which he had referenced in an email the same day, which the government alleged was the corresponding "wire."

The resulting verdict form that the District Court provided to the jury for it to use appeared as follows:

* * *

We find Mark T. Moffett as to

1. **Count 2**, charging wire fraud on or about May 7, 2014 (Exhibit 53):

   _____ not guilty      _____ guilty

2. **Count 3**, charging wire fraud on or about May 14, 2014 concerning a certain FAX (Exhibit 66):

   _____ not guilty      _____ guilty

3. **Count 10**, charging aggravated identity theft on or about May 14, 2014 concerning a certain FAX (Exhibit 66):

   _____ not guilty      _____ guilty

4. **Count 1**, charging wire fraud on or about May 19, 2014 (Exhibit 42):

   _____ not guilty      _____ guilty

5. **Count 4**, charging wire fraud on or about May 22, 2014 concerning a certain FAX (Exhibit 77):

- 7 -

_____ not guilty    _____ guilty

6. **Count 11,** charging aggravated identity theft on or about May 22, 2014 concerning a certain FAX (Exhibit 77):

_____ not guilty    _____ guilty

7. **Count 5,** charging wire fraud on or about August 5, 2014 concerning a certain e-mail (Exhibit 86):

_____ not guilty    _____ guilty

8. **Count 12,** charging aggravated identity theft on or about August 5, 2014 concerning a certain FAX (Exhibit 93):

_____ not guilty    _____ guilty

9. **Count 8,** charging wire fraud on or about August 15, 2014 concerning a certain FAX (Exhibit 124):

_____ not guilty    _____ guilty

10. **Count 6,** charging wire fraud on or about August 20, 2014 concerning a certain e-mail (Exhibit 96):

_____ not guilty    _____ guilty

11. **Count 13,** charging aggravated identity theft on or about August 20, 2014 concerning a certain email (Exhibit 96):

_____ not guilty    _____ guilty

12. **Count 7,** charging wire fraud on or about September 17, 2014 concerning a certain FAX (Exhibit 109):

_____ not guilty    _____ guilty

13. **Count 14,** charging aggravated identity [sic] on or about September 17, 2014 concerning a certain FAX (Exhibit 109):

    _____ not guilty    _____ guilty

14. **Count 9,** charging wire fraud on or about September 4, 2015 concerning a certain FAX (Exhibit 148):

    _____ not guilty    _____ guilty

15. **Count 15,** charging aggravated identity theft on or about September 4, 2015 concerning a certain FAX (Exhibit 148):

    _____ not guilty    _____ guilty

* * *

On the final day of trial, after the close of evidence and closing arguments, the District Court prepared the jury for its deliberations. In doing so, the District Court provided the following instructions about the verdict form:

> Take a look at the verdict slip. I set it up -- simply because I think it may be helpful to you in analyzing the case, I simply put the counts and I set them up chronologically. There's 15 of them. There's two types of counts.
>
> One type charges wire fraud . . . . The other type of charge is aggravated identity theft. The reason that there are different counts are each time the government has alleged that the crime was committed, that's a separate crime, it involved a different, um, document or a different setting. The government has argued that it's the same scheme. I have nothing to say about that. But each -- the law is that each time the law is violated, that's a different crime. That's what the counts allege.

- 9 -

And then I've explained each one and, um, you have a large mass of exhibits and the government suggests -- this is not me suggesting, but I've at least adopted their numbering, the government suggests that the actual document, which is the evidence of the particular crime being committed, where there is a particular document is set forth with the exhibit number. That's what they suggest, it's not what I suggest, but this is so that you'll look there in order to do your analysis.

Let me say one other thing and we'll get into it. On this evidence your verdict on each of the 15 counts can be not guilty, it can be guilty, or it can be any combination of not guilty or guilty, with the following exception. Let me take a look at Numbers 2 and 3, this is the example, but you'll see this again in other pairings throughout this verdict slip, and I use my Numbers 2 and 3 just to illustrate it.

The government says, they've charged in Count 3 that certain facts, which they say is Exhibit 66, is evidence of wire fraud. They also say, in Count 10, that the same facts is evidence of aggravated identity theft. And there is a relationship, and it's this. If you find Mr. Moffett not guilty on Count 3, the wire fraud, you must find him not guilty on the related Count 10, aggravated identity theft. The contrary is not true. If you find Mr. Moffett guilty of wire fraud on Count 3, he's not necessarily guilty on Count 10, and you must go on and evaluate that.

At sidebar following that instruction, counsel for the government asked the District Court to clarify the instruction. The government explained that the District Court had told "the jury that the exhibit number [on the verdict slip was] the evidence

- 10 -

of a crime, but that's actually a reference to the wire, which is a unit of the charge."  Back in front of the jury, the District Court then sought to clarify the instruction:

> I think I said, um, trying to be helpful, I pointed out that, um, the reference to a specific exhibit was what the government says is evidence of the -- of the wire fraud or the aggravated identity theft.  More specifically it's pointed out that that is the document that supposedly went over the wires.  There may be other documents that they claim is evidence, but that's supposedly the document that went over the wires.

The District Court released the jury to begin its deliberations after providing the jury with other instructions not relevant here.  Following approximately an hour of deliberations, the jury sent a note to the District Court.  The note inquired, "Can we please have a written description of what the charges are, definitions and qualifications of wire fraud and identity theft?"  With the jury back in the courtroom, the District Court informed the jurors that the answer to their question was yes, "but not right away."  The District Court explained that it would likely take until the following morning for the court reporter to prepare an exact version of what the court had said, but that the jurors were free to reach a verdict in the meantime.  The jury then resumed deliberations and, just over two hours later, returned a guilty verdict on all 15 charges.

The District Court sentenced Moffett to 54 months in prison on October 28, 2021, and final judgment issued on January 26, 2022. Moffett now timely appeals his convictions.

**II.**

Moffett contends on appeal that the District Court deprived Moffett of his "right to a trial by jury" under the Sixth Amendment to the U.S. Constitution by submitting the verdict form for the jury's use. He further contends that the government has failed to show that the constitutional violation was harmless beyond a reasonable doubt and thus that each of the convictions must be vacated. We agree.

**A.**

The Sixth Amendment provides in relevant part:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation . . . .

The Supreme Court of the United States in construing this constitutional guarantee has long recognized that district courts have substantial discretion both in administering trials in criminal cases and in managing jury deliberations in such trials. See Quercia v. United States, 289 U.S. 466, 469-70 (1933); Bollenbach v. United States, 326 U.S. 607, 612 (1946). The Court

has also long made clear, however, that there are "inherent limitations" on the "privilege of the judge to comment on the facts." Quercia, 289 U.S. at 470.

These "inherent limitations" reflect the practical reality that "under any system of jury trials the influence of the trial judge on the jury is necessarily and properly of great weight" and that a trial judge's "lightest word or intimation is received with deference[.]" Starr v. United States, 153 U.S. 614, 626 (1894). The Court for that reason has long admonished trial judges that, in addressing the evidence, "great care should be exercised that such expression should be so given as not to mislead, and especially that it should not be one-sided." Id. The caution aims to ensure that trial judges do not in addressing the evidence "interfere with the jurors' independent judgment in a manner contrary to the interests of the accused." United States v. Martin Linen Supply Co., 430 U.S. 564, 573 (1977).

Consistent with this understanding of the Sixth Amendment, our precedents recognize that the jury must be free not only from "direct control in its verdict" by the district court but also "from judicial pressure" "[i]n the exercise of its functions." United States v. Spock, 416 F.2d 165, 181 (1st Cir. 1969) ("Put simply, the right to be tried by a jury of one's peers finally exacted from the king would be meaningless if the king's judges could call the turn."). We have thus explained that a

- 13 -

district court in commenting on the evidence to the jury in a criminal case may not do so in a manner that "usurp[s] the jury's factfinding role," United States v. Rivera-Santiago, 107 F.3d 960, 965 (1st Cir. 1997) (per curiam), or "relieve[s] the prosecution of [its] burden in an unfair way," United States v. Argentine, 814 F.2d 783, 787-89 (1st Cir. 1987).

Accordingly, in Rivera-Santiago, we held that a district court's answer to a jury's question that "selected only a part of [a witness's] testimony given on direct examination to be read" back to the jury violated the defendants' Sixth Amendment right to a trial by jury. 107 F.3d at 965-67. We explained that the violation resulted because the district court's answer to the jury's question "culled the evidence" in a manner that was contrary to the defendants' interests. Id. at 967. That was so, we explained, because the district court through the answer effectively directed the jury to consider only certain testimony that favored the government, even though "defendants [a]re entitled to have their theory of the case, as developed through their evidence, presented to the jury on an equal footing with the government's theory of the case." Id.

We also have indicated that a district court may cross the constitutional line even without in effect directing the jury to consider only the government's evidence. We have indicated that the constitutional line also may be crossed whenever the

- 14 -

district court, in addressing the jury regarding evidence, places "undue weight" on portions of the government's evidence and thereby tilts the trial in that party's favor.  United States v. Almonte, 594 F.2d 261, 265 (1st Cir. 1979) (holding that the district court did not err in declining to answer a jury question seeking reutterance of trial testimony related to "the timing of [a particular day's] events," citing United States v. Baxter, 492 F.2d 150, 175 (9th Cir. 1973)); Baxter, 492 F.2d at 175 n.19 (explaining that the district court's denial of a jury's request for testimony from specific witnesses was proper because doing so would have "give[n] over-emphasis to that particular area of evidence").

## B.

We do not confront here a district court's response to a jury's question regarding the evidence as we confronted in prior cases that have addressed Sixth Amendment challenges based on contentions that the district court had commented on the evidence in an impermissible manner.  Nor do we consider here an instance of a trial judge commenting on the evidence in a criminal case that precisely mirrors any fact pattern that either our Circuit or -- as far as we are aware -- any other has encountered.  But, the novelty of this fact pattern does not insulate the District Court's choice to invite the government to select the exhibit to be referenced with respect to each count on the verdict form from

- 15 -

Sixth Amendment review. If anything, the novelty of that choice tends to heighten our concern that, as Moffett contends, that choice fell outside the District Court's considerable discretion to manage a criminal trial. See Spock, 416 F.2d at 183 ("We are not necessarily opposed to new [criminal] procedures just because they are new, but they should be adopted with great hesitation.").

That said, the novelty of the District Court's choice in this case does not suffice in and of itself to show that the procedure was violative of the Sixth Amendment. Instead, under our precedents, we must conduct a "review of the record" so that we may determine whether, given the surrounding "context," the District Court's submission of this verdict form for use by the jury "usurped the jury's factfinding role," Rivera-Santiago, 107 F.3d at 965, in a "manner contrary to the interests of the accused," Martin Linen Supply, 430 U.S. at 573.

The parties appear to agree that, in conducting this inquiry, we must review the District Court's choice to submit this verdict form to the jury under an abuse of discretion standard, given that Moffett preserved this challenge below. We proceed on that understanding. See United States v. Ellis, 168 F.3d 558, 562 (1st Cir. 1999); see also Rivera-Santiago, 107 F.3d at 966 n.6 (citing United States v. Aubin, 961 F.2d 980, 983 (1st Cir. 1992)). And, as we will explain, we conclude that the District Court did abuse its discretion here, even after accounting for the jury

- 16 -

instructions that the District Court gave that pertained to the verdict form.

The government is right that the inclusion of the exhibit numbers on the verdict form did not implicitly "direct the jury" to find Moffett guilty based on certain pieces of evidence. Indeed, the District Court clarified in instructing the jury that the listed exhibits represented only what the government had alleged were the "wires" and "uses." But, we are nonetheless persuaded that -- in context -- the District Court, through the verdict form and the instructions given to the jury that pertained to that form, invaded the jury's power over factfinding by over-emphasizing certain of the government's evidence in a manner that was contrary to Moffett's interests.

## 1.

The District Court gave the verdict form directly to the jury and that form was printed under official court caption. The form then referred to a single government-selected exhibit -- and only that government-selected exhibit, among all the evidence introduced at trial -- for each of the listed counts.

Moreover, the verdict form did not contain any language that suggested that the exhibit that was referenced for each count was to be considered only for a limited purpose as to that count. Instead, the form simply identified the government-selected

- 17 -

exhibit in parentheses next to each count, while refencing no other evidence.

To be sure, none of the government-selected exhibits that is uniquely listed for each count on its own contained sufficient evidence to prove all of the elements of the offense charged for that count. But, the exhibit referenced in each instance contained the very evidence that the government claimed at trial established that Moffett had made the alleged "false . . . representations," 18 U.S.C. § 1343, and/or "uses [of] a means of identification of another person," 18 U.S.C. § 1028A. Thus, for each count, an especially salient component of the evidence on which the government relied in support of the various charges was singled out, while no reference was made to any exhibit or other evidence that Moffett had highlighted at trial in his defense to those same charges.

**2.**

The government does not -- because it cannot -- deny that the verdict form had the qualities that we have just described. The government nonetheless contends that the District Court's choice to submit such a verdict form to the jury did not constitute an abuse of discretion for Sixth Amendment purposes in light of the instructions that the District Court gave to the jury that pertained both to the verdict form and to the evidence more generally.

Specifically, the government contends that the District Court explained in those instructions that the exhibits were referenced on the verdict form only for the purpose of identifying which "wire" and which "use" of a doctor's information was at issue in each count. The government then adds that Moffett did not dispute at trial -- nor does he dispute on appeal -- that the referenced exhibit did in fact refer to a "wire" or "use" of information that had occurred, or that the "wire" or "use" to which each exhibit referred was in fact the "wire" or "use" that the government identified as the predicate "wire" or "use" for the charge set forth in the count. In addition, the government emphasizes that the District Court instructed the jury to review all the evidence in reaching its own conclusions about the ultimate question of whether the government had proved the elements necessary to establish each crime.

The problem with the government's attempt to fend off Moffett's Sixth Amendment challenge by pointing to the jury instructions is that in certain respects the instructions added to the emphasis that the verdict form already gave to the government-selected exhibits merely by referencing them while not otherwise referencing any other evidence. For example, in the course of explaining the verdict form to the jury and the references to the exhibits that the form contains, the District Court stated: "you have a large mass of exhibits and . . . the government suggests

- 19 -

that the [exhibits listed on the form are] the evidence of the particular crime being committed." (Emphasis added.) The District Court then added, "it's not what I suggest, but this is so that you'll look there in order to do your analysis." (Emphasis added.) The District Court went on thereafter to state that "some of these exhibits, which the government says are evidence of wire fraud, the government also says are evidence that Mr. Moffett is guilty of aggravated identity theft." And, even after the government asked the District Court to clarify the purpose for which the verdict form was referencing the government-selected exhibits, the District Court simply instructed the jury that "I pointed out that . . . the reference to a specific exhibit was what the government says is evidence of the . . . wire fraud or the aggravated identity theft. More specifically it's pointed out that that is the document that supposedly went over the wires."

Thus, the record shows that the District Court instructed the jury that the government-selected exhibit referenced in each count constituted what the government alleged was "the evidence of the particular crime being committed" and that the jury was to "look there in order to do [its] analysis." (Emphases added.) As a result, even when considered in the context of the jury instructions, the verdict form did not merely direct the jury's attention in a neutral manner to the "parts of [the evidence] which" the District Court appropriately deemed to be

- 20 -

"important." United States v. Brennan, 994 F.2d 918, 929 (1st Cir. 1993) (quoting Quercia, 289 U.S. at 469)). Rather, even when considered in that fuller context, the verdict form impermissibly privileged a portion of the government's evidence over that of the defendant's, at least by giving "undue weight" to that evidence by singling it out in such a salient manner. Almonte, 594 F.2d at 265; see Quercia, 289 U.S. at 470.

After all, unlike in Brennan, the District Court did not indicate that certain categories of evidence may be relevant to particular issues.[3] Rather, here, the District Court singled out certain exhibits that were being relied on by the government -- and the government alone -- to make out its criminal case against the defendant.

**3.**

The government's remaining argument as to why we should not find error also comes up short. Here, the government claims that the District Court's decision to list a government-selected exhibit for each count on the verdict form was intended only to serve the limited purpose of matching the "wires" and "uses" alleged in the indictment to the charged counts on the verdict

---

[3] The challenged instruction in Brennan was: "In addition, with regard to these charges, you may also consider the evidence concerning Mr. McHugh's loan authority and question whether he acted with intent to injure [the Bank] in his dealings with Mr. Brennan." 994 F.2d at 929. The district court there did not identify particular evidence or link it to particular counts. Id.

form.  The government proceeds to argue that, due to this limited purpose, the District Court's decision to construct the verdict form in a manner that included the references to the government-selected exhibits should be understood as a matter of mere trial administration that fell within the broad range of discretion that a district court has to manage a complicated trial.

To assess the government's contention in this regard, it helps to add some further detail about each of the exhibits in question.  We thus briefly summarize each of them:

- Exhibit 42 (Count 1) (Wire Fraud): "[S]creen shot[s]" of Aegerion's salesforce.com account from May 2014 showing data entries regarding various communications with insurance companies about patients' medical diagnoses. Testimony elicited by the government at trial suggested that the information communicated to the insurance companies was false.

- Exhibit 53 (Count 2) (Wire Fraud): "[S]creen shot[s]" of Aegerion's salesforce.com account from May 2014 showing data entries regarding various communications with insurance companies about patients' medical diagnoses. Testimony elicited by the government at trial suggested that the information communicated to the insurance companies was false.

- Exhibit 66 (Counts 3 & 10) (Wire Fraud & Aggravated Identity Theft): A May 14, 2014 fax of a letter sent from a healthcare provider to an insurance company appealing the denial of coverage for Juxtapid for a patient.  Testimony elicited by the government at trial suggested that the letter contained false information about the patient's medical diagnoses and that the fax cover sheet contained Moffett's handwriting.

- Exhibit 77 (Counts 4 & 11) (Wire Fraud & Aggravated Identity Theft): A May 14, 2014 fax of a letter sent from a healthcare provider to an insurance company seeking coverage for Juxtapid for a patient.  Testimony

elicited by the government at trial suggested that Moffett had prepared the letter but that a doctor refused to sign it because it contained false medical information, and that the fax cover sheet contained Moffett's handwriting.

- Exhibit 86 (Count 5) (Wire Fraud): An August 5, 2014 email from Moffett to an Aegerion employee stating that "new prescriptions for patients" had been faxed to a provider.  Testimony elicited by the government at trial suggested that the patient's diagnostic information in the faxed documents was false.

- Exhibit 93 (Count 12) (Aggravated Identity Theft): An August 5, 2014 fax of a drug authorization form sent from a healthcare provider to an insurance company seeking coverage for Juxtapid.  Testimony elicited by the government at trial suggested that the information on the form had been falsified and that the form contained Moffett's handwriting.

- Exhibit 96 (Counts 6 & 13) (Wire Fraud and Aggravated Identity Theft): An August 20, 2014 email from Moffett to an Aegerion employee with attachments showing a fax of the same date sent from a healthcare provider to Aegerion containing a patient's medical documents, some of which contained information that the testimony elicited by the government at trial suggested was false.  Testimony also suggested the fax cover sheet contained Moffett's handwriting.

- Exhibit 109 (Counts 7 & 14) (Wire Fraud & Aggravated Identity Theft): A September 17, 2014 fax of a letter sent from a healthcare provider to an insurance company appealing the denial of coverage for Juxtapid for a patient.  Testimony elicited by the government at trial suggested that the doctor was not familiar with the letter, that it contained false information about the patient's medical diagnoses, and that the fax cover sheet contained Moffett's handwriting.

- Exhibit 124 (Count 8) (Wire Fraud): An August 14, 2014 fax of a letter sent from a healthcare provider to an insurance company appealing the denial of coverage for Juxtapid for a patient.  Testimony elicited by the government at trial suggested that the doctor whose

signature appeared on the letter had never approved or signed it, that the letter contained false medical information, and that the fax cover sheet contained the handwriting of Moffett's ex-girlfriend, who testified that Moffett provided her with information necessary to fill out such forms.

- Exhibit 148 (Counts 9 & 15) (Wire Fraud & Aggravated Identity Theft): A September 4, 2015 fax of an authorization form sent from a healthcare provider to an insurance company seeking coverage for Juxtapid for a patient. Testimony elicited by the government at trial suggested that the medical information was false, that the doctor had not approved the form, and that it contained Moffett's handwriting.

These summaries of the contents of the referenced government-selected exhibits reveal that, with respect to the wire fraud counts, the listing of the government-selected exhibits on the verdict form did more than simply provide proof that a certain "wire" had been sent, in the way that, say, evidence of meta-data about a wire transmission might. Instead, these summaries make clear that the referenced exhibits constituted evidence of the content of the communication contained in the "wire" that pertained to each count that plainly bears not only on the element of the wire fraud offense that concerns whether there was a "wire" but also on other elements of that offense. For example, in addition to constituting the "wires" themselves, each exhibit contained or referred to medical information that the government argued at trial constituted false statements that Moffett himself added or caused to be added to the documents that constituted the alleged "wires" themselves. It should therefore be unsurprising that each of the

exhibits was also the subject of significant trial testimony that the government argued tended to link Moffett to each "wire."

The same is no less true if we consider the exhibits referenced in connection with the aggravated identity theft counts, as they, too, were hardly barebones. They each contained not only the doctor's information that the government alleged that Moffett had "used," but also the handwriting that the government had labored at trial to convince the jury was Moffett's.

Thus, even if the "wire" element was not itself in material dispute for any of the wire fraud counts, and even if the fact that a doctor's information was "used" was similarly not in material dispute for any of the identity theft counts, it cannot be said that the exhibits were relevant to the jury's consideration of the charges only for the purpose of proving those singular elements of any of the charged offenses. And, as noted, the government makes no such contention, despite asserting that the exhibits were listed for the limited purpose of identifying the "wires" and "uses" at issue.[4] We thus reject the government's contention that, in context, the references to the exhibits on the verdict form did not "place undue weight" on specific parts of the

---

[4] The District Court did not provide an instruction that the jury could consider the referenced exhibits only for such a limited purpose, and we therefore do not consider what the effect of such an instruction would be on the error or harm identified in this case.

government's evidence, Almonte, 594 F.2d at 265, because the exhibits that were referred to on the jury form bore only on uncontested aspects of the case against Moffett. For, because the record shows otherwise, it follows that we cannot accept the government's argument that the District Court's choice to submit this verdict form fell within the District Court's considerable discretion to organize a complicated criminal trial in a manner that would avoid jury confusion. See United States v. Miller, 738 F.3d 361, 383 (D.C. Cir. 2013) (noting the availability of "other options" that do not implicate the "line between judicial clarification and impermissible judicial interference" in holding that the district court abused its discretion in referring to evidence in its answer to the jury's question). Indeed, at oral argument, the government itself acknowledged (though it did not raise this concern to the District Court) that "this is not something district courts should be doing."

## III.

Having determined that the District Court abused its discretion in violation of Moffett's Sixth Amendment right by submitting the verdict form that we have described, we still must determine "whether or not the error is such that it requires us to reverse the convictions on some or all of the wire fraud [and identity theft] counts." Argentine, 814 F.2d at 788-89. In other words, we must determine whether the error was a harmless one.

Because the District Court's error in submitting this verdict form to the jury is of a "constitutional dimension," the government bears the burden of establishing that the error was harmless beyond a reasonable doubt. Rivera-Santiago, 107 F.3d at 966-67; see also Argentine, 814 F.2d at 789. Thus, the government must show that, on this record, there is no "reasonable possibility that the error at issue influenced the jury in reaching the verdict." Rivera-Santiago, 107 F.3d at 967.[5]

To prove each wire fraud violation, the government had the burden of proving beyond a reasonable doubt that Moffett "devised or intend[ed] to devise" a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises," and "transmit[ed] or cause[d] to be transmitted by means of wire" a communication in interstate or foreign commerce "for the purpose of executing such scheme or artifice." 18 U.S.C. § 1343. And, to prove each

---

[5] In arguing that any error here was harmless, the government cites to a case articulating our harmless error standard for "non-constitutional evidentiary errors." United States v. Hicks, 575 F.3d 130, 143 (1st Cir. 2009) ("We review non-constitutional evidentiary errors for harmlessness; an error is harmless if it is 'highly probable that the error did not influence the verdict.'" (quoting United States v. Roberson, 459 F.3d 39, 49 (1st Cir. 2006))). Because we find a constitutional error similar in kind to the errors that we found in Rivera-Santiago and Argentine, however, we follow those cases and consider the error here to be of a "constitutional dimension." 107 F.3d at 967; 814 F.2d at 789. And, aside from citing Hicks, the government develops no argument as to why we should not do so.

- 27 -

aggravated identity theft count, the government had the burden of proving that, "in relation to [one of the wire fraud offenses]," Moffett "knowingly . . . use[d], without lawful authority, a means of identification of another person."[6]

In arguing that any error with respect to the verdict form was harmless, the government presses a similar argument to the one that, as we have just seen, it advanced in service of its argument that there was no error at all. Specifically, the government argues that the District Court's inclusion of the exhibits on the verdict form was harmless even if in error because their inclusion on that form at most placed emphasis on evidence that established what was in the end only an uncontested fact -- that a communication qualifying as a "wire" for each count had been sent, or that a doctor's information had been "use[d]." But, as we have already explained, the exhibits themselves demonstrate that they contain evidence relevant not only to establishing those

---

[6] The nature of the identity theft statute is such that the government's ability to prove those charges turns on its ability to prove the wire fraud charges. See 18 U.S.C. § 1028A ("Whoever during and in relation to [a wire fraud offense], knowingly . . . uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."). Thus, because each identity theft count is necessarily tied to a wire fraud count, it follows that if the District Court's error was not harmless with respect to a wire fraud count, the error was not harmless with respect to the corresponding identity theft count. Regardless, though, we conclude that the error cannot be construed as harmless as to any of the counts in any event.

singular elements but also to the jury's consideration of other elements of the charged crimes. Thus, the content of the exhibits is such that there is reason to be concerned that the verdict form, at least when combined with the District Court's instruction to the jury that the exhibits referenced on the verdict form constituted "the evidence" of the charged offenses and to "look there" to do "your analysis," had the effect of tilting the playing field to the government's advantage. Given the nature of the exhibits, there is reason to be concerned that the express reference to them -- and to no other evidence -- on the verdict form would draw the jurors' attention away from the evidence that Moffett put forward to show that he was not guilty of any of the charged offenses beyond reasonable doubt and toward the case that the government was making for finding him guilty of each of those offenses.[7]

---

[7] To the extent that the government suggests that we should assign any weight to Moffett's failure to specifically contest the existence of the wires at trial, we reject the argument. Indeed, in Argentine, the government argued that the Court should write off any concerns about the implicit suggestion that the defendant had in fact participated in the wires at issue (there telephone calls) because "these matters were undisputed." 814 F.2d at 788. As we recognized, this "misses the point" because "it is . . . settled, in a criminal case, that '[t]he plea of not guilty places every issue in doubt, and not even undisputed fact may be removed from the jury's consideration,'" and therefore "[n]o matter how persuasive the government's evidence may seem to the court, there is no burden on a defendant to dispute it." Id. (alterations in original) (first quoting United States v. Natale, 526 F.2d 1160, 1167 (2d Cir. 1975), cert. denied, 425 U.S. 950

To be sure, the government does also appear to suggest that any error here was harmless for the distinct reason that any such worry is misplaced simply because none of the exhibits in and of itself sufficed to prove all of the elements of the offense charged in any count. That is significant, the government contends, because we must assume that the jury followed the District Court's general instruction to consider all the evidence in the record on equal footing. Thus, the government reasons, with some force, that we should not understand the jury's evaluation of the evidentiary record to have been influenced by any emphasis of the government-selected exhibits on the verdict form, because the jury to convict would have had to have looked beyond the exhibits referenced on the verdict form in any event and so must be assumed to have accounted for any competing evidence before it that Moffett had introduced.

The problem with the government's theory in this regard, however, is that it was the jury's task to weigh a "large mass" of evidence to determine as to each wire fraud count whether Moffett was guilty of devising or intending to devise a scheme to defraud or to obtain money by means of false representations in an interstate wire. 18 U.S.C. § 1343. And, it was the jury's task to then weigh that same evidence to determine whether Moffett had

_____

(1976), then DeCecco v. United States, 338 F.2d 797, 798 (1st Cir. 1964)).

"knowingly . . . use[d], without lawful authority, a means of identification of another person" in the commission of each wire fraud offense. 18 U.S.C. § 1028A. The concern is thus that this process "might well have been shortcircuited by [the District Court's] injection of the incriminating aspect[s] of the evidence" through the references to the government-selected exhibits on the verdict form. Rivera-Santiago, 107 F.3d at 967 (rejecting harmless error argument on this basis).

True, the government makes a strong case for our understanding that the jury did not stop its assessment of the record after consulting only the exhibits referenced on the verdict form. But the jury's neutral assessment of the evidence could have been knocked off course nonetheless in making its way through the evidentiary morass. In particular, there is reason to be concerned that the jury would have started with the government's hand-picked exhibits referenced on the verdict form -- and then considered the case through the framing of it that the government had pressed -- not because it chose on its own to do so for reasons of efficiency but because it understood the District Court to have encouraged it to do so.

Thus, even if the circumstantial evidence of Moffett's guilt was "significant," we cannot be assured that the jury would have ultimately viewed all the evidence together -- including Moffett's exculpatory evidence -- in the same neutral manner that

it would have absent the District Court's decision to list on the verdict form only the precise exhibits that the government was arguing showed through their contents that Moffett had committed the charged crimes and then to instruct the jury both that those exhibits were in the government's view "the evidence of the particular crime" and to "look there in order to do your analysis." See id.; see also Spock, 416 F.2d at 182 (explaining that special verdict forms are disfavored in criminal cases because a jury's consideration of charges from the lens of a "step by step" framework favors the government and is more likely to lead to a guilty verdict); cf. Braley v. Gladden, 403 F.2d 858, 860 (9th Cir. 1968) (where the district court had failed to include a "not guilty" option on the verdict form, noting that, while "it may not [have been] unreasonable to assume that the jury inferred from the [the district court's] instructions that it might be empowered to write its own form of a verdict of not guilty, it [would have been] equally reasonable to assume that the jury inferred that the judge intended that only one verdict was possible").  And as this is not a case in which the evidence of guilt is overwhelming, we conclude that "there is a reasonable possibility that the error at issue influenced the jury in reaching its verdicts in this case" and thus that "the verdicts cannot stand." Rivera-Santiago, 107 F.3d at 967.

**IV.**

For the foregoing reasons, we **VACATE** Moffett's convictions as to all counts and **REMAND** for further proceedings not inconsistent with this opinion.